**In re ALUMINUM MILLS CORPORATION,**
Debtor.

**ALUMINUM MILLS CORPORATION, By and Through its OFFICIAL UNSECURED CREDITORS COMMITTEE, Plaintiff,**

v.

**CITICORP NORTH AMERICA, INC., a Delaware Corporation, Frederick S. Miller, Denis A. Mola, John D. Mull, Armand, Miller & Mull, Inc., an Illinois Corporation, Sigma Associates, Inc., an Illinois Corporation, IBJ Schroder Bank & Trust Co., a New York Banking Corporation, Charles D. Gelatt, and the Gelatt Corporation, a South Dakota Corporation, Defendants.**

Bankruptcy No. 90 B 04050.
Adv. No. 90 A 0934.

United States Bankruptcy Court,
N.D. Illinois, E.D.

Oct. 1, 1991.

---

Mark L. Prager, Foley & Lardner, Chicago, Ill., for plaintiff.

Chester H. Foster, Jr., Durkin, Foster & Roberts, Chicago, Ill., for defendants Miller, Mola, Mull, Armand, Miller & Mull, Incorporated and Sigma Associates, Inc.

Francis X. Gross, Jr., Mark K. Thomas, Jeff J. Marwill, Debra A. Harvey, Amy A. Hijjawi, Katten, Muchin & Zavis, Chicago, Ill., for defendant Citicorp North America, Inc.

David E. Leichtfuss, Michael, Best & Friedrich, Milwaukee, Wis., James R. Troupis, Ann Ustad Smith, Steven P. Means, Michael, Best & Friedrich, Madison, Wis., for defendant Gelatt and Gelatt Corp.

## CONTENTS

| Subject | Page |
| --- | --- |
| Introduction | 875 |
| Facts alleged | 875 |
| The Parties | 875 |
| Events Prior to the LBO | 876 |
| The LBO | 878 |
| Post–LBO Projections and Loans | 879 |
| Debtor's Releases on the Eve of Bankruptcy | 880 |
| The Complaint | 880 |
| Jurisdiction | 882 |
| Standards on Rule 12(b)(6) Motions to Dismiss | 882 |

| Subject | Page |
|---|---|
| Standards on Rule 9(b) Motions to Dismiss | 882 |
| Committee Standing to Prosecute Fraudulent Conveyance Claims as Estate Property | 884 |
| Elements of a Fraudulent Conveyance | 885 |
| (a) Intentional Fraud–§ 548(a)(1) and Ill.Rev.Stats. ch. 59 ¶ 4 | 885 |
| (b) Constructive Fraud—Fraud in law under Section 4 of Rev.Stats. ch. 59 | 888 |
| Breach of Fiduciary Duty | 891 |
| Inducement of Breach of Fiduciary Duty | 892 |
| Preferential Transfers—Section 547 | 892 |
| Equitable Subordination—Section 510(c) | 893 |
| Conclusion | 896 |

## MEMORANDUM OPINION ON DEFENDANTS' MOTIONS TO DISMISS

JACK B. SCHMETTERER, Bankruptcy Judge.

Plaintiff and debtor-in-possession Aluminum Mills Corporation ("Debtor"), by and through its Official Committee of Unsecured Creditors ("Committee"), has filed a nine count Complaint against the following parties: Citicorp North America, Inc. ("Citicorp"); Frederick S. Miller ("Miller"); Denis A. Mola ("Mola"); John D. Mull ("Mull"); Armand, Miller & Mull, an Illinois corporation ("AM & M"); IBJ Schroder Bank & Trust Co., a New York banking corporation ("Schroder"); Charles D. Gelatt ("Gelatt"); and, the Gelatt Corporation, a South Dakota corporation ("Gelatt Corp.") (collectively, the "Defendants").

The Complaint alleges that a January 1988 leveraged buyout of the assets of Debtor (the "LBO") constituted various fraudulent and preferential transfers to Defendants under the Illinois Fraudulent Conveyance Act and Sections 548 and 547 of the Bankruptcy Code ("Code"). The Complaint seeks to avoid those asserted transfers pursuant to Section 544(b) of the Code. The Complaint also alleges that certain Defendants breached their fiduciary duty to Debtor and its unsecured creditors by consummating the LBO.

Defendants have each filed a motion under F.R.Bankr.P. 7012 (R. 12 F.R.Civ.P.) to dismiss various counts of the Complaint (the "Motions"). Following the hearing held May 20, 1991 and having considered the pleadings and briefs filed, the Court denies all Motions for reasons stated below.

### FACTS ALLEGED

The following facts are pleaded.

### The Parties

Prior to January 15, 1988, "Aluminum Mills Corporation" was the name of an Illinois corporation that operated a cold rolling aluminum plant in Lincolnshire, Illinois ("Old Aluminum Mills"). The business of Old Aluminum Mills began in March 1960. In January 1966, Defendant Charles D. Gelatt ("Gelatt"), either individually or through one or more corporations owned or controlled by him, purchased Old Aluminum Mills.[1] Gelatt continued to own and control Old Aluminum Mills until the events which transpired in January 1988.

Prior to January 1988, plaintiff and debtor-in-possession Aluminum Mills Corporation ("Debtor," "Aluminum Mills") was known as Aluminum Mills Acquisition Corporation ("AMAC"). AMAC was comprised of certain officers and directors of Defendant AM & M.

---

**1.** In March 1968, Old Aluminum Mills bought approximately 21 acres of land contiguous to the property on which its plant is located.

Debtor, by and through the Committee,[2] brings this action against several defendants. Defendants Citicorp and Schroder are alleged to have been the lenders who provided financing for the LBO. Defendant AM & M is engaged in the investment banking business and was retained by Aluminum Mills to procure funding for the LBO. Defendants Miller, Mola, and Mull were and are shareholders and managing directors of AM & M. In addition, Miller, Mull, and Mola were and are directors of Aluminum Mills. Miller is also the sole owner of Defendant Sigma, an Illinois corporation.

As previously mentioned, Defendant Gelatt was the owner of Old Aluminum Mills prior to the January 1988 LBO. Gelatt became an officer of AMAC prior to or around the time of the LBO. As a result of the LBO, Defendant Gelatt Corp. became the successor in interest to Old Aluminum Mills.

*Events prior to the LBO*

At the request of Old Aluminum Mills, sometime prior to August 1987 Harris Trust & Savings Bank ("Harris") prepared a written analysis of a possible leveraged buyout of Old Aluminum Mills ("Harris Analysis"). In its Complaint, the Committee alleges that after reviewing several LBO alternatives, the Harris Analysis concluded that a $30,000,000 leveraged buyout would render the company insolvent, leaving it with a negative net worth of approximately $6,678,000. The Complaint further alleges that the Harris Analysis was prepared at the direction of and was made available to the directors and shareholders of Old Aluminum Mills and that Defendants Gelatt, Citicorp, Miller, Mull, Mola, and AM & M were all aware of the conclusions and recommendations contained in the Harris Analysis prior to the January 1988 LBO.

On or about October 30, 1987, certain officers and directors of AM & M formed AMAC for the alleged purpose of acquiring all the assets and operations of Old Aluminum Mills. AMAC was a shell corpora-

tion with no assets, liabilities, or operations of its own. AMAC was owned and controlled by limited partnerships which were and are owned or controlled by Defendants Miller, Mull, Mola, and AM & M (collectively, the "Purchasing Defendants").

On November 11, 1987, AMAC entered into an Asset Purchase Agreement with Old Aluminum Mills under which AMAC agreed to purchase all of the assets and assume or retire virtually all of the liabilities of Old Aluminum Mills (the "Agreement"). Gelatt executed the Agreement on behalf of Old Aluminum Mills while Mull acted for AMAC.

The Agreement provided that AMAC would pay Old Aluminum Mills $34,000,000 in cash at closing, would retire a $3,000,000 promissory note owed by Old Aluminum Mills to A.M. of Illinois, Inc., and would issue 9,000 shares of AMAC's preferred stock, valued at approximately $9,000,000, to Charles Gelatt, for a total purchase price of $34,000,000.

AMAC retained AM & M, an investment banking firm allegedly controlled by the other Purchasing Defendants, to arrange financing for the proposed LBO. The Complaint alleges that the Purchasing Defendants paid AM & M a $650,000 fee for its services and that such fees were to be paid from loans to AMAC, which loans were to be secured by the assets of Aluminum Mills.

The Purchasing Defendants prepared an Acquisition Financing Memorandum ("Purchasing Memorandum") which they presented to various financial institutions for the purpose of obtaining loans to fund the LBO. The Purchasing Memorandum contained projections of Debtor's sales, revenues, cash flow, profits, and anticipated financial performance for a ten year period following the LBO. The Complaint alleges that the Purchasing Defendants knew or should have known that due to certain circumstances, the income and cash flow projections were false and misleading, and that Debtor would be unable to meet its

---

2. On October 18, 1990, this Court entered an order authorizing the Committee to prosecute on behalf of Debtor's estate the claims set forth in this Adversary Complaint.

obligations as they became due after the LBO.

In particular, the Committee contends that the Purchasing Memorandum predicted that after the LBO Aluminum Mills would be able to meet its obligations as they became due only if the following events occurred: the 21 acres of vacant land adjacent to the Aluminum Mills plant was sold for an estimated $2,056,000; Aluminum Mills received substantial tax refunds resulting from tax loss carrybacks; Aluminum Mills' sales increased by approximately 35 percent in 1988 and the cost of producing its products increased by only approximately 28 percent; and, the plant, which was operating at 30 to 40 percent capacity prior to the LBO, underwent an increase in capacity of up to 85 percent. The Committee contends that (1) the LBO was structured so that none of the proceeds from the sale of the real estate would actually go to Aluminum Mills to meet its ongoing obligations; (2) the real property was "illiquid" and could not be sold within the first year of the LBO for the price contemplated [3]; and (3) Defendants knew or should have known that due to the structure of the LBO, Aluminum Mills would not be entitled to the anticipated tax refunds as a matter of law. Furthermore, the Committee contends that the projections in the Purchasing Memorandum failed to account for the cost to Aluminum Mills of maintaining an $8,000,000 life insurance policy for Charles Gelatt pursuant to the preferred stock agreement between Gelatt and Aluminum Mills.

The Committee alleges that the Purchasing Defendants knew or should have known that the projections contained in the Purchasing Memorandum were both unreasonable and inaccurate. The Committee further alleges that after reviewing the Purchasing Memorandum, Citicorp, Schroder, and Gelatt also knew or should have known that the projections were unreasonable and inaccurate.

On or about December 4, 1987, Citicorp submitted a loan proposal to the Purchasing Defendants which contemplated that in exchange for a loan to AMAC of up to $17,000,000 of the $34,000,000 purchase price, Citicorp would receive (1) a first priority security interest in all of Aluminum Mill's machinery and equipment, (2) a first mortgage on Aluminum Mill's real property, and (3) a second priority lien on all of Aluminum Mill's accounts receivable, inventory, trade names, and general intangibles.

At some point during negotiations over Citicorp's loan proposal, Citicorp requested that AMAC provide a letter certifying that Aluminum Mills was solvent and currently able to meet its obligations as they became due, and would continue to be solvent and able to meet its obligations as they became due after the LBO (the "solvency letter"). However, Citicorp eventually dropped its demand for a solvency letter, allegedly at the insistence of the Purchasing Defendants. The Committee asserts that as a result, no accountant's solvency analysis was ever conducted for the Purchasing Defendants, Citicorp, or any other participant in the LBO.

The Complaint further alleges that Citicorp's loan proposal was initially conditioned upon receipt by Citicorp of an independent accountant's review of the Purchasing Memorandum and a "fairness opinion" by an investment firm acceptable to Citicorp. In the course of negotiations, Citicorp dropped its demands for both the independent accountant's review and the fairness opinion. Thus, with the exception of the Harris Analysis, the proposed LBO was never reviewed by either an independent accountant or an independent investment banker.

On or about December 29, 1987, Schroder submitted a loan proposal to the Purchasing Defendants. That proposal contemplated that in exchange for extending to AMAC a $10,000,000 revolving line of credit to fund partially the acquisition of Alu-

---

**3.** The Complaint alleges that Aluminum Mills tried without success to sell the vacant land for almost three years after the LBO.

878

minum Mills, Schroder would receive a first security interest in all of Aluminum Mills' current assets, including its accounts receivables, inventory, cash deposits, and marketable securities.

In addition to the Harris Analysis, the Complaint alleges that certain financial information available prior to the LBO should have put all Defendants on notice that the LBO would render Aluminum Mills insolvent. In this regard, the Committee cites (1) the audited balance sheet of Old Aluminum Mills for the fiscal year ending July 31, 1987, which reported total assets of $10,770,270; (2) a fair market valuation prepared by Citicorp employees which valued Aluminum Mills' assets at $11,000,000 to $12,000,000; and (3) an appraisal prepared by a firm retained by AM & M which estimated that the orderly liquidation value of Aluminum Mills was $12,695,800.

The above-mentioned appraisal was performed by the Manufacturer's Appraisal Company ("MAC") and was dated December 30, 1987 ("First MAC Appraisal"). On the same date, MAC also prepared a second appraisal at the request of the Purchasing Defendants, which estimated that the going concern "fair market value" of Old Aluminum Mills was $35,156,600 ("Second MAC Appraisal"). The Committee contends that the Second MAC Appraisal was unreliable and overly optimistic, and should not have been relied upon in evaluating the success of the LBO. In support of this contention, the Committee points to an internal Citicorp memorandum, dated after the LBO on March 6, 1989, which found the Second MAC Appraisal to have been "completely unreliable" and "overly optimistic" ("Citicorp Memorandum"). The Citicorp Memorandum concluded that the Second MAC Appraisal had placed unrealistically high values on Aluminum Mills' machinery and equipment. The Citicorp Memorandum

estimated that the fair market value of Aluminum Mills was in fact approximately $8,626,900.

The Committee alleges that improper valuation standards were employed in connection with the Second MAC Appraisal, and that its conclusions were calculated with the aim of accommodating the Purchasing Defendants. The Committee asserts that in light of the Harris Analysis and other pre-LBO estimates, which it claims Defendants "recklessly disregarded," Defendants failed to adequately review the reasonableness or accuracy of the Second MAC Appraisal.

*The LBO*

On or about January 15, 1988, Defendants consummated the LBO.[4] As a result of the various transactions surrounding the LBO, AMAC acquired all of the assets and operations, and assumed or retired all of the liabilities, of Old Aluminum Mills. AMAC changed its name to Aluminum Mills Corporation, and Old Aluminum Mills changed its name to the Gelatt Corporation of Illinois, Inc., which ultimately merged with Gelatt Corporation, a Wisconsin corporation, which in turn merged with Defendant Gelatt Corp.

The Complaint alleges that Old Aluminum Mills, now Gelatt Corp., and Gelatt received almost $34,000,000 in total consideration from the LBO which consisted of the following: $17,000,000 directly from Citicorp; $2,871,500 directly from Schroder; and, $3,000,000 which Schroder transferred directly to A.M. of Illinois, Inc., an affiliate of Gelatt and Old Aluminum Mills, to retire a note owed by Old Aluminum Mills to A.M. of Illinois, Inc. Aluminum Mills also issued 9,000 shares of redeemable preferred stock to Gelatt as additional consideration, which stock the parties allegedly valued at $9,000,000.[5]

4. Leveraged buyouts have been described as follows:
An LBO is a purchase transaction based on pledging the assets of the purchased entity to secure the purchase price. Typically, a small group of investors and managers *combine* to purchase the outstanding shares of a company by creating a large debt by ... obtaining a loan from a financial institution. Almost no

equity capital is invested. The debt, to repeat, is secured by pledging the assets of the acquired company as security. *Kupetz v. Wolf,* 845 F.2d 842, 845–46 (9th Cir.1988).

5. *According to the Complaint, the preferred stock was secured by the life insurance policy maintained by Aluminum Mills on Gelatt's life, the proceeds of which were to be used to re-*

The Committee essentially concludes that although Aluminum Mills assumed all of the liabilities for the Citicorp and Schroder loans in the amount of $23,500,000, by granting the lenders a first priority security interest in all of Aluminum Mills' assets, none of the proceeds from those loans were retained by Aluminum Mills for use as operating capital or otherwise. Thus, Aluminum Mills did not receive fair consideration for assuming those liabilities and obligations, and accordingly was rendered insolvent and unable to meet its debts as a result of the LBO.

The Complaint alleges that Gelatt and Old Aluminum Mills also received approximately $1,460,505.96 from AMAC, and that said amount was paid from loans secured by Aluminum Mills' common stock, and investment banking fees which had been paid to AM & M from either proceeds of the LBO or post-LBO loans from Schroder. The Committee alleges that with the exception of the investment banking fees and these borrowed funds, the Purchasing Defendants did not contribute any of their own capital to fund the LBO.

Finally, the Committee alleges that in addition to the above liabilities, Aluminum Mills also assumed (1) $8,500,000 of other unidentified liabilities belonging to Old Aluminum Mills; (2) liability for the $9,000,000 of redeemable preferred stock issued to Gelatt; (3) the obligation to pay premiums of approximately $300,000 per annum to maintain the life insurance policy for Charles Gelatt; and (4) obligations to pay a $400,000 "investment fee" to Citicorp and $325,000 in investment and closing fees to Schroder. The Committee contends that as a result of the LBO Debtor had total liabilities, as reflected by its balance sheet, of in excess of $32,000,000.

*Post-LBO Projections and Loans*

In addition to the Citicorp Memorandum discussed earlier, the Committee refers to other valuations conducted after the LBO as evidence of the accuracy of the pre-LBO estimates of Aluminum Mills' financial condition. First, the Committee cites to an analysis conducted by Resource Strategies, Inc. ("RSI"), who was retained by a company interested in purchasing Aluminum Mills. The RSI report concluded that the fair market value of Aluminum Mills was between $7,000,000 and $9,000,000. Second, the Complaint alleges that Citicorp retained MB Valuation Services, Inc. ("MB") to conduct an appraisal of Aluminum Mills after the LBO. MB concluded that the in-place liquidation value of Aluminum Mill's assets was $10,132,000, and that the in-place fair market value of the assets was between $18,000,000 and $20,000,000.[6]

The Committee contends that because the LBO rendered Aluminum Mills unable to meet its obligations as they became due, Aluminum Mills was forced to borrow additional funds and use those funds to pay its operating and long-term debts to the extent it was able to do so. The Committee alleges that within the first six weeks following the LBO, Aluminum Mills borrowed an additional $2,700,000 from Schroder to fund its operations, and that by August 1988 Aluminum Mills had borrowed a total of $4,000,000 from Schroder to pay operating expenses and debt service. Having already borrowed $6,000,000 from Schroder to fund the LBO, that $4,000,000 exhausted Aluminum Mill's line of credit with Schroder.

The Committee alleges that by February 1988, one month after the closing of the LBO, Aluminum Mills had defaulted on its loan agreements with Citicorp and Schroder. In October 1988, Schroder refused to lend any additional funds to Aluminum

deem the preferred stock at a set value of $9,000,000. Debtor was required to redeem the preferred stock over an eight-year period commencing January 11, 1988, and was required to make earlier redemptions out of the proceeds of any sale of real estate. Moreover, Gelatt was to receive the $9,000,000 stated value of the stock upon the dissolution or liquidation of Alu-

minum Mills, before any distribution to common shareholders.

**6.** After filing for relief in bankruptcy, Debtor entered into a sales contract in which it agreed to sell all of its assets for $6,900,000. Debtor represented to the Court that such sale price was the best price that could be obtained under the circumstances.

Mills, and demanded to be taken out of its loans with Aluminum Mills and replaced by another lender. Thus, on June 23, 1989 Congress Financial Corporation ("Congress") agreed to grant Aluminum Mills a revolving line of credit in exchange for a first priority security interest in Aluminum Mills' accounts receivable and inventory. The Committee alleges that said line of credit was used primarily to pay off the debt to Schroder rather than to provide working capital to Aluminum Mills. Schroder was paid $7,000,000 as a result of the June 1989 refinancing, and received a promissory note from Aluminum Mills with regard to the remaining $3,000,000 debt. On its part, Schroder agreed to subordinate its security interest in Aluminum Mills' accounts receivable and inventory to that of Congress'.[7]

*Debtor's Releases on the Eve of Bankruptcy*

The Committee alleges that in the week prior to Debtor's filing of its bankruptcy petition, Defendants Miller, Mull, and Mola, as directors of Debtor, caused Debtor to execute releases in favor of Citicorp and Charles Gelatt. First, the Complaint alleges that on February 26, 1990, those Defendants caused Debtor to execute releases in favor of Gelatt and companies owned by him, including Gelatt Corp., and that in exchange for these releases, Gelatt and/or said companies paid Debtor approximately $509,472.72 (the "Gelatt releases"). Those funds did not go to the Debtor for its own use, but rather were paid immediately to Citicorp.[8]

Second, the Complaint alleges that on March 2, 1990, three days prior to the bankruptcy filing, Debtor's principal officers and directors, including Defendants Miller, Mola, and Mull, caused Debtor to execute a general release of all claims against Citicorp (the "Citicorp release"). In exchange for said general release, Citi-

corp did not provide any consideration to Debtor, but rather paid $100,000 to Defendant Sigma, a company owned by Miller. The Complaint charges that the $100,000 was purported to be for "consulting fees," even though that was not the actual purpose for the payment.[9]

On March 5, 1990, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Debtor's schedules state that the amount of secured claims against Debtor, including those of Citicorp and Schroder, exceeds $20,000,000, and that the amount of unsecured claims is approximately $6,822,830.45. The Complaint alleges that "[a]t least 42 of the debtor's current unsecured creditors had claims against the debtor at or prior to the time of the January 1988 LBO." In its Memorandum in Opposition to the Defendants' Motions to Dismiss, the Committee also argued (but has not pleaded) that at least five of the current unsecured creditors have claims that "relate back to the time of the January 15, 1988 LBO." The Committee suggests that these claims arose from trade accounts with Debtor "under which the debtor owed money to the creditor at all times from the date of the LBO through the date of the debtor's bankruptcy filing."

*The Complaint*

Count I seeks to recover as fraudulent conveyances under Ill.Rev.Stat. ch. 59, ¶ 4 the security interests transferred by Aluminum Mills to Citicorp and Schroder in exchange for the financing of the LBO. Count I seeks to avoid the transfer pursuant to Section 544(b) of the Bankruptcy Code. This Count alleges that Debtor did not receive fair or adequate consideration for the security interests, and that the LBO left Debtor insolvent and unable to meet its obligations as they became due. Further, Count I alleges that Defendants Citicorp and Schroder knew or should have known

---

7. On June 23, 1989, Aluminum Mills apparently also conveyed to Citicorp a third priority security interest in its current assets which included accounts receivable and inventory.

8. The Complaint alleges that Debtor also redeemed Gelatt's redeemable stock as part of this transaction.

9. The Complaint also alleges that Citicorp's $100,000 payment to Sigma was also made in exchange for Miller's agreement to resign as president of Debtor. Miller was replaced by William T. Nihill, the current president of Debtor.

the effect which the LBO would have on Debtor's financial condition, and that Defendants acted with actual intent to hinder, delay, and defraud Debtor's unsecured creditors by entering into a scheme to strip Debtor of its assets without regard to the interests of the unsecured creditors.

Count II seeks to recover as fraudulent conveyances under Ill.Rev.Stat. ch. 59, ¶ 4 the $25,000,000 in cash and $9,000,000 worth of redeemable preferred stock allegedly transferred for the benefit of Gelatt and Gelatt Corp. Count II alleges that the LBO left Debtor with insufficient assets to continue in business, and that as a result Debtor was unable to pay its unsecured creditors. Count II alleges that Gelatt and Gelatt Corp. knew or should have known the effect that the LBO would have on the financial condition of Debtor, and that Defendants engaged in a general plan to strip Debtor of its assets without regard to the claims of the unsecured creditors.

Count III alleges that the releases executed in favor of Citicorp, Gelatt, and Gelatt Corp. on the eve of Debtor's bankruptcy were made at a time when Debtor was insolvent, and were made with the intent to hinder, delay, and defraud Debtor's unsecured creditors. Count III contends that Debtor never received fair consideration in exchange for the releases, that Gelatt's payment of $509,472.72 was never retained by Debtor, and that in any event the released claims were worth far more than the $509,472.72 paid. Thus, under Section 544(b) Count III seeks to avoid the releases as fraudulent conveyances under Ill.Rev. Stat. ch. 59, ¶ 4.

Count IV asserts an equitable subordination claim against Citicorp. Count IV first contends that Citicorp became an insider and controlled certain decisions made by the Debtor. Count IV alleges that Citicorp had a security interest in approximately 85% of the Debtor's stock and could have asserted voting control over Debtor at any time. Count IV alleges that Citicorp used this source of power plus the its payment to defendant Sigma to control Debtor's decisions concerning the termination and replacement of the Debtor's executive offi-

cers, the release of claims against Citicorp and Gelatt, Debtor's bankruptcy filing, and several other matters. Count IV also contends that Citicorp's conduct amounts to gross misconduct, and in support, alleges that Citicorp knew when it made its loan that the LBO would leave the Debtor insolvent and unable to meet its obligations to unsecured creditors. Count IV further alleges that Citicorp caused Debtor to waive valuable rights it had against Citicorp through the execution of the releases. Thus, under § 510(c), Count IV seeks to equitably subordinate Citicorp's claims to the claims of the unsecured creditors.

Count V seeks to avoid two transfers as preferences under Section 547 of the Code. First, Count V contends that within 90 days of the Chapter 11 filing Debtor transferred at least $699,634.86 to Citicorp, and that said amount included funds which Gelatt and his companies had paid in exchange for the releases of claims which Debtor had granted to them. Second, Count V alleges that within 90 days of the filing, Debtor also transferred interests in life insurance policies and proceeds to Gelatt. In alleging the elements of an avoidable preference under Section 547, Count V contends that because the underlying debts owed to Citicorp and Gelatt are avoidable as fraudulent transfers, the above transfers enabled Citicorp and Gelatt to receive more than they would have received if this case were under Chapter 7 of the Code.

Count VI alleges that Defendants Miller, Mola, Mull, and Gelatt breached their fiduciary duty to Aluminum Mills and its unsecured creditors by planning and completing the LBO when they knew or should have known that the LBO would render Debtor insolvent, and by failing to investigate adequately the effect the LBO would have on Debtor and its creditors.

Count VII alleges that Defendants Miller, Mola, and Mull also breached their fiduciary duty to Debtor and its creditors by causing Debtor to execute the releases in favor of Citicorp, Gelatt, and companies controlled by Gelatt. Specifically, Count VI contends that Defendants failed to investigate adequately the claims covered by

the releases, and caused Debtor to release valuable claims without fair consideration.

Count VIII seeks punitive damages against Defendants Miller, Mull, and Mola for their alleged breach of fiduciary duties detailed in Counts VI and VII.

Count IX alleges that Citicorp knowingly and intentionally induced Miller, Mola, and Mull to breach their fiduciary duties to Debtor and its unsecured creditors, and accordingly seeks actual damages.

Finally, Count X contends that AM & M negligently prepared false and misleading projections and forecasts regarding the financial condition of Aluminum Mills after the LBO, including misrepresenting the value of assets and Debtor's solvency, and failing to properly evaluate the Second MAC Appraisal. Thus, Count X seeks damages as a result of AM & M's alleged negligence.

All Defendants have filed Motions to Dismiss the Counts alleged against them for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6), F.R.Bankr.P. 7012. The Motions also contend that certain Counts should be dismissed for failure to plead fraud with sufficient particularity as required by Fed. R.Civ.P. 9(b), F.R.Bankr.P. 7009.

## DISCUSSION

### Jurisdiction

This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334(a). Because the action before the Court seeks to avoid fraudulent and preferential transfers under Sections 544(b) and 547 of the Bankruptcy Code, this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) (F & H). As to whether this Court has core or related jurisdiction over other counts, or pendent jurisdiction under views advanced in *In re Direct Satellite Communications*, 91 B.R. 5 (Bankr. E.D.Pa.1988) and to afford complete relief under *In Matter of Hallahan*, 936 F.2d 1496, 1508 (7th Cir.1991), will await further briefing.

### Standards on Rule 12(b)(6) Motions to Dismiss

In order for Defendants to prevail on their motion to dismiss, it must appear beyond a doubt from the pleadings that the Committee can prove no set of facts in support of its claims which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Gorski v. Troy*, 929 F.2d 1183, 1186 (7th Cir.1991). The issue is not whether the Committee will ultimately prevail, but whether the Committee has pleaded a cause of action sufficient to entitle him to offer evidence in support of his claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court must consider both pleaded facts and reasonable inferences drawn from pleaded facts, in a light most favorable to the plaintiff when reviewing a defendant's motion to dismiss. *Gorski v. Troy*, 929 F.2d at 1186; *Corcoran v. Chicago Park District*, 875 F.2d 609 (7th Cir.1989); *Ross v. Creighton University*, 740 F.Supp. 1319, 1326 (N.D.Ill.1990).

### Standards on Rule 9(b) Motions to Dismiss

Although the Motions seek dismissal pursuant to Rule 12(b)(6), they also argue that the Committee has failed to plead fraud with sufficient particularity as required under Rule 9(b). Rule 9(b) provides:

In all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally. Fed.R.Civ.P. 9(b).

With respect to a claim involving fraud, the plaintiff must state "with particularity" the circumstances constituting fraud in order to ensure that the defendant may adequately respond to the complaint as well as to protect him from unjustified injury to reputation. *In re Doppelt*, 57 B.R. 124, 126 (Bankr.N.D.Ill.1986), citing *Tomera v. Galt*, 511 F.2d 504 (7th Cir.1975).

However, although Rule 9(b) has been used to dismiss fraudulent conveyance

claims which failed to meet its requirements, a court must read Rule 9(b) with Fed.R.Civ.P. 8 (F.R.Bankr.P. 7008), which requires only that a plaintiff give notice of his claims through a simple, concise, and direct statement. *Id.* "Generally, a Complaint is considered sufficient when it sets forth the time, place, particular contents of the false representation, the identity of the party making the misrepresentation, and the consequences of the misrepresentations." *Id.* at 127, citing *Rudolph v. Merrill Lynch,* 100 F.R.D. 807, 809 (N.D.Ill. 1984).

■ The allegations of the Complaint here are well within the pleading requirements of Rule 9(b). The Complaint is both detailed and comprehensive, including 141 paragraphs of facts in support of the Committee's numerous allegations. The Complaint describes in detail the events which took place prior to, during, and after the LBO. The Complaint describes the participation of each Defendant in the LBO and related transactions, the effect of the LBO on Debtor, various projections and the financial condition of Debtor during said events, and the assets which were involved. Finally, the Complaint states the factual and legal basis for each claim and the defendants against whom the claim is being brought. *See Wieboldt Stores, Inc. v. Schottenstein,* 94 B.R. 488, 498 (N.D.Ill. 1988) (allegations in the complaint met Rule 9(b) requirements because it described the events surrounding the LBO, the defendants' participation in the LBO, the effect of the LBO on the debtor, the assets involved in the LBO, and the factual and legal basis of the claims asserted).

■ In other words, as in *Wieboldt,* the Complaint here "has included enough

information ... and has stated its claims with sufficient clarity to advise each defendant ... of the claims made against them." *Id.* Defendants' objection to the Complaint under Rule 9(b) essentially is that the Committee has failed to plead the evidence it plans to support its claims; however, such pleading is not required under Rule 9(b). It is enough that the Complaint describes the specific injuries it seeks to redress, namely the assertedly fraudulent and preferential transfers and breaches of fiduciary duty raised in the Complaint, and the legal theories upon which it bases said claims. *See Id.* The Complaint contains enough facts to allow Defendants to prepare an effective response or defense to the claims. *See Id.*[10]

Defendant Gelatt argues that Count III, which seeks to avoid the releases granted to Gelatt by Debtor, should be dismissed for failure to plead fraud with sufficient particularity. Specifically, Gelatt contends that the Complaint fails to identify the claims which were purportedly released with respect to the value of the claims and the terms of the releases. However, allegations regarding the Gelatt releases are indeed detailed and sufficient under Rule 9(b). The Complaint alleges that on February 26, 1990, Miller, Mull, and Mola caused Debtor to execute releases in favor of Gelatt and companies controlled by him, and that in exchange for such releases, Gelatt and his companies paid Debtor approximately $509,472.72. These allegations specify the exact date the purported releases were given, the precise amount of consideration paid, and the recipient of the releases. Such allegations contain enough information to give Defendants Gelatt and Gelatt Corp. notice of what releases the Committee seeks to set aside.[11]

---

**10.** Several of the Complaint's allegations of fraud are pleaded "upon information and belief." When pleading fraud, facts which are peculiarly within the adverse party's knowledge may be pleaded "upon information and belief" if accompanied by a statement of the facts and circumstances upon which the belief is founded. *In re Janikowski,* 60 B.R. 784, 790 (Bankr. N.D.Ill.1986), citing *Duane v. Altenburg,* 297 F.2d 515, 518 (7th Cir.1962). The Committee's allegations "upon information and belief" are well-pleaded here since they each relate to the

LBO transfers, the facts and circumstances of which the Committee has provided in great detail.

**11.** Gelatt also argues that Count V fails to plead fraud with sufficient particularity regarding Debtor's alleged transfer of its interests in certain life insurance policies and proceeds to Gelatt within 90 days of the bankruptcy filing. Again, because Count V describes the approximate date of the transfers, the interest being transferred, and the recipient of the transfer,

Citicorp also maintains that Count III's allegations regarding the Citicorp release lack sufficient particularity to withstand a motion to dismiss. Count III states that on March 2, 1990, three days prior to the bankruptcy filing, Debtor's principals caused Debtor to execute a general release of all claims against Citicorp. In exchange for said release, Citicorp allegedly paid $100,000 to Defendant Sigma, a company owned by Miller. These allegations clearly describe the claims which were released since a "general release" indicates that all possible claims which Debtor had against Citicorp were included under the release. The allegations also describe the precise date on which the release was executed, the exact amount of consideration paid, and who received the consideration. Again, the allegations are sufficient to give Citicorp notice of what claims were purportedly released, namely all possible claims.

Thus, the Court finds that all averments of fraud in the Complaint are pled with sufficient particularity as required under Rule 9(b).

### Committee Standing to Prosecute Fraudulent Conveyance Claims as Estate Property

Defendants Citicorp and Schroder argue that the fraudulent conveyance claims asserted here are "personal" claims of individual creditors which only those individual creditors have standing to prosecute. Defendants admit that a trustee or committee does have standing to bring general claims on behalf of the estate, but not personal claims.

The Seventh Circuit has distinguished personal claims from general claims:

A cause of action is "personal" if the claimant himself is harmed and no other claimant or creditor has an interest in the cause.... If the liability is to all credi-

tors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim.... A trustee may bring only a general claim. His right to bring a claim "depends on whether the action vests in the trustee as an assignee for the benefit of creditors, or, on the other hand, accrues to specific creditors." *Koch Refining v. Farmers Union Cent. Exch., Inc.,* 831 F.2d 1339, 1349 (7th Cir.1987).

Section 541 of the Code offers an expansive definition of what is property of the estate by including all "legal and equitable interests" the debtor had as of the filing of the bankruptcy petition. 11 U.S.C. § 541. Section 541(a)(3) specifically includes as an interest "[a]ny interest in property that the trustee recovers under section ... 550" of the Code, which section allows the trustee to recover "for the benefit of the estate" any transfers avoided under Sections 544, 547, or 548. 11 U.S.C. § 550. Thus, courts have generally held that property of the estate under Section 541 includes "property fraudulently or improperly transferred by the debtor before bankruptcy." *Koch,* 831 F.2d at 1343.

In the event not all creditors here have standing under Illinois law to assert the fraudulent conveyance claims, that would not cause the fraudulent transfer claims to become personal claims. Even if only one creditor has standing, any recovery by that single creditor would be for the benefit of the entire estate. Thus, clearly a trustee has standing to prosecute the claims raised here since they are "general" claims of the estate.

On October 28, 1990, this Court authorized the Committee to prosecute all fraudulent conveyance and preference claims on behalf of all creditors. It is well-established that 11 U.S.C. §§ 1103(c)(5) and 1109(b)[12] imply a right for creditors' com-

Defendant Gelatt has sufficient notice of the Committee's claim against him.

**12.** Section 1109(b) of the Code provides:
A party in interest, including the debtor, the trustee, a creditors' committee ... may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b).
Section 1103(c) provides:
(c) A committee appointed under section 1102 of this title may—
(5) perform such other services as are in the interest of those represented.
11 U.S.C. § 1103(c)(5).

mittees to initiate adversary proceedings in the name of the debtor in possession so long as approval of the bankruptcy court has been obtained. *See e.g., In re STN Enterprises,* 779 F.2d 901, 904 (2nd Cir. 1985); *In re Monsour Medical Ctr.,* 5 B.R. 715 (Bankr.W.D.Pa.1980) (creditors' committee has an implied authority to sue to avoid a preference or fraudulent transfer where trustee or debtor-in-possession unjustifiably fails or refuses to bring suit); *In re Jermoo's Inc.,* 38 B.R. 197 (Bankr. W.D.Wis.1984). By entering the October 28, 1990 Order, this Court approved the Committee's authority to initiate this adversary proceeding on behalf of Debtor and its creditors. Thus, the Committee has standing to prosecute the "general" claims raised in the Complaint pursuant to 11 U.S.C. §§ 1109(b) and 1103(c)(5).

### Elements of a Fraudulent Conveyance

Relatively few courts have written on the subject of the applicability of fraudulent conveyance laws to LBOs.[13] They have uniformly found that transfers to and between a debtor and its LBO lenders, controlling shareholders, and companies owned by said shareholders, are subject to provisions of Section 548 of the Code and the Uniform Fraudulent Conveyance Act ("UFCA").[14] There is no reason to go against this established precedent. *See Anderson,* 55 B.R. at 926 ("[i]f this holding is too broad in light of the present marketplace, it is the legislature, not the courts, that must narrow the statute.") Accordingly, the Court now must determine whether the Complaint here asserts facts which are sufficient to allege causes of action under the relevant fraudulent conveyance statutes.

a. Intentional Fraud—Section 548(a)(1) and Ill.Rev.Stat. ch. 59 ¶ 4

In order to state a cause of action under Section 548(a)(1) of the Code, the Committee must allege that (1) the transfer was made within one year before the bankruptcy petition was filed, and (2) the transfer was made with actual intent to hinder, delay, or defraud Debtor's creditors. 11 U.S.C. § 548(a)(1). Similarly, Section 4 of chapter 59 Ill.Rev.Stat. ("Section 4") has been construed as prohibiting not only "fraud in law" (constructive fraud) but also "fraud in fact" (intentional fraud). *Tcherepnin v. Franz,* 457 F.Supp. 832, 836 (N.D.Ill.1978). Section 4 provides in pertinent part:

> Every gift, grant, conveyance, assignment, or transfer of … any estate, real or personal … made with the intent to disturb, delay, hinder, or defraud creditors or other persons … shall be void as against such creditors, purchasers or other persons. Ill.Rev.Stat. ch. 59, ¶ 4.

■ The proof requirements for "fraud in law" and "fraud in fact" differ. In fraud in fact cases, a court must find a specific intent to defraud creditors, while in fraud in law cases, fraud is presumed from the circumstances. *Tcherepnin,* 457 F.Supp. at 836. The proof requirements for finding intentional fraud under Section 548(a)(1) and fraud in fact under Section 4 of the Illinois UFCA are substantially the same.[15]

---

13. *See Kupetz v. Wolf,* 845 F.2d 842 (9th Cir. 1988); *United States v. Gleneagles Inv. Co. Inc.,* 565 F.Supp. 556 (M.D.Pa.1983), *aff'd, United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3rd Cir.1986); *Credit Managers Ass'n v. Federal Co.,* 629 F.Supp. 175 (C.D.Cal.1985); *In re Ohio Corrugating Co.,* 91 B.R. 430 (Bankr. N.D.Ohio 1988); *In re Metro Communications, Inc.,* 95 B.R. 921 (Bankr.W.D.Pa.1989); *In re Kaiser Steel Corp.,* 87 B.R. 154 (Bankr.D.Colo. 1988); *Moody v. Security Pacific Business Credit, Inc.,* 127 B.R. 958 (W.D.Pa.1991); *Wieboldt,* 94 B.R. 488; *In re Anderson Industries,* 55 B.R. 922 (Bankr.W.D.Mich.1985).

14. Although the Illinois legislature has adopted the Uniform Fraudulent Transfer Act ("UFTA") which supersedes Ill.Rev.Stat. ch. 59, ¶ 4, or, the UFCA, there is no indication from the Illinois legislature that the new provisions should apply to transfers that occurred before its effective date of January 1, 1990. *In re Martin,* 113 B.R. 949, 956 n. 2 (Bankr.N.D.Ill.1990); *In re Grabill Corp.,* 121 B.R. 983, 996–97 n. 8 (Bankr.N.D.Ill. 1990). Accordingly, this Court applies chapter 59, § 4, the statutory provision in effect in January of 1988, the date of the alleged LBO and its related transfers.

15. Indeed, the fraudulent conveyance provisions of the Bankruptcy Code "substantially mirror" those of the UFCA in that they provide for both intentional and constructive fraud. *See Moody v. Security Pacific Business Credit, Inc.,* 127 B.R. 958 (W.D.Pa.1991).

Specifically, "actual intent" under Section 548(a)(1) has been described as follows:

> "Actual intent" ... is rarely susceptible to proof and "must be gleaned from inferences drawn from a course of conduct".... A general scheme or plan to strip the debtor of its assets without regard to the needs of its creditors can support a finding of actual intent.... [C]ertain "badges of fraud" can form the basis for a finding of actual intent to hinder, delay or defraud. *Wieboldt*, 94 B.R. at 504 (citations omitted).

Similarly, the court in *Zwick v. Catavenis*, 331 Ill. 240, 162 N.E. 869, 872 (1928), in a discussion of fraud in fact under Section 4, referred to "badges of fraud" as being "signs or indicia from which the existence of fraud may be properly inferred as a matter of evidence". Thus, the Court's inquiry as to the Complaint's allegations of intentional fraud is the same under both Section 548(a)(1) and Section 4.

In *Wieboldt*, the court found that a complaint brought by the debtor contained allegations of actual fraud sufficient to withstand a motion to dismiss. The complaint in *Wieboldt* alleged that the controlling shareholders had exchanged their shares with the actual intent to hinder, delay or defraud the debtor's unsecured creditors, and that the LBO lenders and controlling shareholders had structured the LBO transfers in an attempt to evade fraudulent conveyance liability. *Wieboldt*, 94 B.R. at 504. The *Wieboldt* court found those simple allegations sufficient to withstand a motion to dismiss under Rule 12(b)(6). *Id.* The Complaint here makes similar allegations throughout the Complaint. This Complaint withstands the Motions to Dismiss pursuant to the reasoning of *Wieboldt*.

Despite the *Wieboldt* analysis, Defendants Citicorp, Schroder, and Gelatt argue that such allegations are insufficient to state a cause of action because they merely mimic the words of the statute. However, even if this Court were to demand more than what *Wieboldt* appears to require, the Committee's allegations of actual fraud are still sufficient.

Indeed, the basis of the *Wieboldt* reasoning was that the complaint also alleged that various participants in the LBO had knowledge of the following: that the acquisition of the debtor was to be financed through an LBO and with no funds of their own, that the debtor was insolvent prior to the LBO, and that all of the debtor's assets would be fully encumbered as a result of the LBO. *Id.* at 502. In addition, the complaint alleged that the lenders were well aware of each other's loan to the acquisition company, and knew that said company intended to use the loan proceeds only to leave the debtor with completely encumbered assets. *Id.* Thus, *Wieboldt* recognized that prior cases which had analyzed LBOs under fraudulent conveyance laws had focused "not on the formal structure of the transaction but rather on the knowledge or intent of the parties involved in the transaction." *Id.* In support of that view, *Wieboldt* examined the two circuit court cases which have analyzed LBOs as possible fraudulent conveyances.

In *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986), the Third Circuit found the LBO lender liable under fraudulent conveyance laws because it had participated in the negotiations surrounding the LBO transactions and consequently had known that the proceeds of its loan to the acquisition company would encumber the debtor's assets to the point of insolvency. *Tabor*, 803 F.2d at 1295–96. In contrast, in *Kupetz v. Wolf*, 845 F.2d 842 (9th Cir.1988), the Ninth Circuit refused to find the selling shareholders liable because there was no showing that they had known that the purchaser intended to finance the takeover by leveraging the debtor's assets. *Kupetz*, 845 F.2d at 848. The trustee in *Kupetz* therefore failed to show that the shareholders intended to defraud the debtor's creditors. *Id.* Thus, *Wieboldt* found the *Kupetz* and *Tabor* opinions to be significant because they both indicated that an LBO is fraudulent only when the circumstances of the transfers

were not "above board." *Wieboldt*, 94 B.R. at 502, quoting *Kupetz*, 845 F.2d at 847. In other words, courts will look to whether LBO participants had knowledge of: (1) the true financial condition of the debtor at the time of the LBO, and (2) whether the corporate acquisition was to be accomplished via the leveraging of debtor's assets.

The Complaint here alleges that Citicorp, Schroder, and Gelatt, and indeed all of the Defendants, knew or should have known that the LBO was structured so that Debtor would not retain any of the proceeds of the loans, but would assume all obligations to repay those loans. The Complaint also alleges that said Defendants knew or should have known prior to the LBO that the LBO would render Debtor insolvent, severely undercapitalized, and unable to meet its obligations as they became due. In particular, the Complaint describes various written analyses of which it alleges Defendants had direct knowledge. These analyses include the Harris Analysis, the pre-LBO balance sheet of Aluminum Mills, the First MAC Appraisal, and the Purchasing Defendants' Memorandum (collectively, the "Written Reports"). The Complaint describes in detail the financial information contained in each of the Written Reports, and alleges that each Report concluded that the LBO would have a disastrous effect upon Debtor.[16] In essence, the Complaint alleges that Defendants' actual intent to hinder, delay, or defraud creditors is evidenced by the fact that despite this knowledge, Defendants elected to proceed with the LBO.

The Purchasing Defendants argue that the conclusions which the Committee draws from the Written Reports are either misleading or in error. The Purchasing Defendants have attached exhibits of their own in support of their Motion. However, such assertions are inappropriate on a motion to dismiss under Rule 12 standard discussed

earlier. This is not a summary judgment procedure under Rule 56. "[W]hile this court must accept as true all well-pleaded allegations of the complaint, it need not dismiss a claim merely because exhibits ... raise questions about the truth of certain allegations." *Wieboldt Stores, Inc. v. Schottenstein*, 111 B.R. 162, 174–75 n. 21 (N.D.Ill.1990). For purposes of pleading actual intent, it is enough that the Complaint alleges that the Defendants knew or should have known of the conclusions in the Written Reports.

With respect to Citicorp, the Complaint also alleges as evidence of actual intent Citicorp's agreement to drop its initial demands for a solvency letter, and an independent accountant's review and fairness letter, as conditions precedent to its funding the LBO. The Complaint further alleges that Citicorp's requests for the above items were dropped upon insistence of the Purchasing Defendants. Thus, the Complaint can be said to plead another "badge of fraud" and sufficiently pleads actual intent. *See Wieboldt*, 94 B.R. at 495 (in which the court noted that at the insistence of a selling shareholder, an LBO lender dropped its original demand for a solvency letter as a condition precedent to its funding the LBO).

Defendant Schroder argues that the Committee fails to allege that Schroder either reviewed or had any knowledge whatsoever of the Harris Analysis, the Purchasing Defendants' Memorandum, or the post-LBO Citicorp Memorandum, and therefore fails to allege any "badges of fraud" or course of conduct from which actual intent can be inferred with respect to Schroder. However, the Complaint alleges that both Citicorp and Schroder knew or should have known that the income and cash flow projections in the Purchasing Defendants' Memorandum were unreasonable and inaccurate for a variety of reasons specified in the Complaint.[17] Moreover, the Complaint

---

**16.** Specifically, the Complaint alleges that because the various Written Reports estimated that the going concern value of Aluminum Mills' assets was between $11,000,000 and $18,000,000, Citicorp knew that Debtor's assumption of over $32,000,000 in liabilities in the course of the

LBO would render Debtor insolvent by at least $14,000,000.

**17.** For example, the Complaint alleges that the Defendants knew or should have known that as a matter of law Aluminum Mills would not be

also alleges that Schroder knew or should have known that although its loan would be secured by Debtor's assets, the proceeds of the loan would not be retained by Debtor. Such allegations are sufficient to plead actual intent under *Wieboldt, Tabor Court,* and *Kupetz. See Kupetz,* 845 F.2d at 848 (shareholders were not liable since there was no evidence that they knew that the purchase of their company was to be accomplished by means of a leveraged buyout); *Tabor,* 803 F.2d at 1295–96 (LBO lender was liable since it participated in the LBO negotiations and knew that the loan proceeds would deplete debtor's assets); *Wieboldt,* 94 B.R. at 502 (actual fraud was sufficiently pleaded since the complaint alleged that the lenders knew of each other's respective loans to the debtor and that the proceeds of the loans were to be used to fund a leveraged buyout).

Finally, in addition to the Written Reports, the Complaint also alleges with respect to Gelatt that he knew from experience operating Old Aluminum Mills that Debtor would be unable to meet its obligations as they became due after the LBO. Again, because such allegation pleads knowledge on the part of Gelatt, it also sufficiently pleads actual intent. Thus, with respect to Citicorp, Schroder, and Gelatt, the Court finds that the Complaint sufficiently pleads actual intent to hinder, delay or defraud creditors pursuant to Section 548(a)(1) and Section 4.

### b. Constructive Fraud—Fraud in Law Under Section 4 of Ill.Rev.Stats. ch. 59 [18]

As discussed earlier, Illinois and other jurisdictions recognize a constructive fraud theory called "fraud in law" under which there is no requirement of actual intent to defraud. In order to prove fraud in law, three elements must be established: (1) a voluntary gift, (2) an existing or contemplated indebtedness against the debtor, and (3) failure of the debtor to retain sufficient property to pay the indebtedness. *In re Martin,* 113 B.R. 949, 957 (Bankr. N.D.Ill.1990), citing *State Bank of Clinton v. Barnett,* 250 Ill. 312, 95 N.E. 178, 181 (1911).

Defendants do not object to the sufficiency of the Committee's allegations with respect to the above three elements. However, Defendants contend that the Complaint still fails to state a cause of action because it inadequately alleges that any current unsecured creditors have existing claims which date back to the time of the challenged transfers as required under Illinois law. Although the Court agrees with Defendants' reading of Illinois law, the Court nevertheless finds that the Complaint does adequately allege the existence of preexisting creditors.

---

entitled to certain tax refunds which the projections relied upon.

**18.** With the exception of Gelatt, Defendants do not raise any objections to the sufficiency of the Committee's allegations of constructive fraud under Section 548(a)(2) of the Code. Section 548(a)(2) provides that a trustee may avoid a transfer if the debtor (1) received less than reasonably equivalent value for the property transferred; and (2) either (a) was insolvent or became insolvent as a result of the transfer, (b) retained unreasonably small capital after the transfer, or (c) made the transfer with the intent to incur debts beyond its ability to pay. 11 U.S.C. § 548(a)(2).

Gelatt argues that the Committee's allegation that Debtor received less than reasonably equivalent value for the Gelatt releases is insufficient to give notice of the Committee's precise claim. Specifically, Gelatt argues that even if the $509,-000 which Gelatt paid for the releases did go directly to Citicorp, as alleged in the Complaint, such payment benefitted Debtor by paying down the Citicorp loan. However, in *Wieboldt,* the court found that although the debtor had sold certain real property to a limited partnership for $30 million and used the proceeds to pay off part of a $35 million debt it owed to a lender, the debtor did not receive a benefit from the transfer. *Wieboldt,* 94 B.R. at 506. That court found that the defendants knew the conveyance would neither increase the debtor's assets nor result in a net reduction of its liabilities. *Id.* This is precisely what the Complaint here alleges with regard to the Gelatt releases. It alleges that such transaction did not benefit Debtor in that the conveyance did not increase Debtor's assets or result in a net reduction of its liabilities. Thus, pursuant to *Wieboldt,* all elements of Section 548(a)(2) have been sufficiently pleaded, including the allegations concerning the Gelatt releases.

It is well-established [19] that in order to have standing to assert fraud in law claims under Section 4 of the Illinois act, plaintiff must allege the existence of an unsecured creditor whose claim against the debtor was pending at the time of the alleged fraudulent transfer. In *In re Heartland Chemicals, Inc.*, 103 B.R. 1012, 1016 (Bankr.C.D.Ill.1989), the court found that a creditor may avoid a transaction where the debt owed at the time the bankruptcy petition was filed was "identical" to the debt owed at the time of the challenged transaction. *Heartland*, 103 B.R. at 1016. The *Heartland* court analyzed Illinois law and also concluded that

> when a debt is owing at the time the transfer is paid off, it may not be resurrected by a subsequent extension of credit. *Id.* (citation omitted).

The court found the rationale for such holding to be

> a creditor must be prejudiced by a transfer in order to challenge it, and a creditor whose claim is paid off is simply not prejudiced by the transfer. *Id.*

Accordingly, *Heartland* dismissed two fraud in law counts raised against the debtor because the complaint did not allege that the creditor's claim existed at the time of the challenged transfers. *Id. See also Mandolini Co. v. Chicago Prod. Suppliers*, 184 Ill.App.3d 578, 132 Ill.Dec. 765, 767, 540 N.E.2d 505, 507 (1st Dist.1989) ("The general law in Illinois is that only those creditors who had existing claims at the time of the transfer may complain that the transfer of property was in derogation of their rights; and the burden is on the creditor to establish the existence of a preexisting debt").

Courts which have applied fraudulent conveyance law to LBOs also follow reasoning similar to that in *Heartland*. In *In re Ohio Corrugating Co.*, 91 B.R. 430, 435 (Bankr.N.D.Ohio 1988), the court stated that "the constructive fraud provisions of the Bankruptcy Code may only be invoked to protect creditors whose claims existed at the time the conveyance was made or the obligation was incurred." *Ohio*, 91 B.R. at 435. Indeed, two courts have gone so far as to find that only preexisting creditors may challenge transfers surrounding an LBO regardless of whether the cause of action is fraud in fact or fraud in law. *See Kupetz*, 845 F.2d at 849, n. 16; *Credit Managers*, 629 F.Supp. at 180. The *Kupetz* court reasoned that

> Because fraudulent conveyance statutes were designed to protect creditors from secret transactions by debtor, the same rules should not apply when the transaction is made public. Future creditors may not complain when they knew or could easily have found out about the transaction. This certainly appears to be the case in this particular LBO [where the trustee had not claimed or presented evidence that any of the future creditors was not aware of the purchaser's financial dealings].... *Kupetz*, 845 F.2d at 849, 850, n. 16 (emphasis omitted).

Similarly, the court in *Credit Managers*, reasoned that "only those who were creditors at the time of the transaction should have the right to attack the transaction." *Credit Managers*, 629 F.Supp. at 180. That court found that most claims had arisen after the buyout, and that these creditors therefore had made a "post-buyout decision to extend credit on new terms to a new entity...." *Id.*

The Complaint here alleges that "at least 42 of the debtor's current unsecured creditors had claims against the debtor at or prior to the time of the January 1988 LBO." The Committee further claims in its Memorandum in Opposition to the Motions to Dismiss that "at least five current creditors ... have existing claims based upon open accounts with the debtor under

---

**19.** The Committee cites certain cases in support of its argument that subsequent creditors may have standing to assert fraud in law claims under Section 4. Each of these cases, however, focuses upon a party's actual intent to deceive creditors, and therefore are not actually fraud in law cases, but are instead fraud in fact cases. Thus, those authorities are inapplicable to the present inquiry. *See e.g., Johnson v. Canfield–Swigart Co.*, 292 Ill. 101, 126 N.E. 608, 614 (1920); *In re Haas Co.*, 131 F. 232 (7th Cir.1904); *Dorocke v. Farrington*, 43 Ill.App.2d 394, 193 N.E.2d 593 (1st Dist.1963).

which amounts have continually been due and owing at all times between the January 15, 1988 LBO and the date of the debtor's bankruptcy filing on March 5, 1990." Of course an argument does not a pleading make. However, the Complaint elaborates by describing the open accounts as trade accounts under which Debtor has continuously owed money to the creditor.

Defendants argue that the above allegations are insufficient to show that any of the current unsecured creditors has the same claim that existed at the time of the LBO. In particular, Defendant Schroder argues it is not enough that the Committee has alleged existence of creditors who had open accounts with Debtor. He cites *Heartland* which ruled that a subsequent extension of credit after a debt has been paid off at the time of the challenged transfer does not revive a creditor's standing for purposes of asserting fraud in law. *See Heartland*, 103 B.R. at 1016.

This Court disagrees with Schroder's contentions. Claims arising from open trade accounts with Debtor constitute preexisting claims sufficient to confer standing upon the Committee under Illinois law. In *Menconi v. Davison*, 80 Ill.App.2d 1, 225 N.E.2d 139, 141–42 (1st Dist.1967), the court found that although a claim was not reduced to judgment until after the debtor had transferred assets, the creditor still had a preexisting claim because the sales contract which "bound [the debtor] to payment, and upon which his liability was afterwards established," was in existence at the time the fraudulent transfer was made. *Menconi*, 225 N.E.2d at 141–42.

Similarly, the Complaint here alleges that commercial relationships between trade creditors and Debtor were in place from the time of the LBO to the date of the bankruptcy petition. It was contemplated by the parties at the time of the LBO that Debtor would be incurring liability throughout that period. In other words, agreements for open accounts clearly were in place at the time of the LBO and continued until the time of the bankruptcy petition. Thus, it is alleged that debts which existed at the time of the bankruptcy filing were substantially the same debts as those which existed at the time of the LBO in that they arose from the same commercial relationships on the same accounts.

As discussed earlier, courts have reasoned that a creditor must be prejudiced by a transfer in order to challenge it, and that a creditor whose claim is paid off is simply not prejudiced by the transfer. *See Heartland*, 103 B.R. at 1016. For example, in *Credit Managers*, the court noted that the majority of creditors had made a post-LBO decision to extend credit on new terms to a new entity, and therefore had no right to attack the LBO as harmful to them. *Credit Managers*, 629 F.Supp. at 180. In contrast, a typical trade account contemplates a revolving indebtedness even after payment without the execution of any new contract with new terms. Thus, the alleged trade creditors here could very well have been prejudiced by the LBO since their relationships with Debtor were in place prior to the LBO and allegedly continued without interruption until the bankruptcy filing.

In *Wieboldt*, the defendants challenged debtor's standing to assert a claim under Section 544(b) because the debtor had "failed to identify a single creditor who could have challenged the transactions at the time they occurred." *Wieboldt*, 94 B.R. at 506, n. 27. The court responded by characterizing the defendants' reading of the complaint as "hypertechnical." *Id.* The court reasoned that since the debtor was unable to pay at least $7 million in company obligations and was in default to one of its lenders at the time of the LBO, the court could "fair[ly] infer from th[o]se facts that a creditor existed who could have challenged the LBO transfers at the time they occurred." *Id.* Similarly, the Complaint here alleges that immediately after the LBO, Debtor had total liabilities of $32 million and was in default to both Citicorp and Schroder. Thus, the Complaint indicates that there must be a current creditor whose claim was pending at the time of the LBO. Even if the Committee did not allege the existence of open accounts, its allegation that at least 42

current creditors had claims against the debtor at or prior to the time of the LBO, by itself should be sufficient to confer standing upon the Committee to assert its constructive fraud claims.[20]

Accordingly, the Court denies the Motions to Dismiss the Committee's constructive fraud claims under Section 4.

### Breach of Fiduciary Duty

Counts VI and VII of the Complaint purport to state a cause of action against the Purchasing Defendants for breach of fiduciary duty. The Complaint alleges that as officers and directors of Debtor, the Purchasing Defendants owed Debtor and its creditors a fiduciary duty of good faith, care, and loyalty. Count VI alleges that the Purchasing Defendants breached that duty by formulating and consummating the LBO when they knew or should have known that the LBO would render Aluminum Mills insolvent, and by failing to adequately investigate the effect the LBO would have on Aluminum Mills and its creditors. Count VII alleges that the Purchasing Defendants further breached their fiduciary duty by failing to adequately investigate the claims covered by the Citicorp and Gelatt releases, and by granting the releases without adequate or fair consideration to Debtor.

■■■ The Purchasing Defendants first argue that the Committee lacks standing to bring an action against them as directors for breach of fiduciary duty. However, the Committee, standing in the shoes of a trustee pursuant to this Court's October 18, 1990 Order, clearly has the right to bring any action in which the debtor has an interest, including actions against the debtor's officers and directors for breach of duty or misconduct. *Wieboldt*, 94 B.R. at 507, citing *Koch Refining v. Farmers Union Central Exchange*, 831 F.2d 1339, 1348 (7th Cir.1987), *cert. denied* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988).

As discussed previously, although a trustee may maintain a general claim, he may not prosecute a claim for which recovery would be personal to the claimant. *Koch*, 831 F.2d at 1349. The Committee here is not asserting "personal" claims of individual creditors, but rather is alleging that both Debtor and its unsecured creditors have suffered damages as a result of the Purchasing Defendants' actions. As the court in *Wieboldt* noted in allowing the debtor to state a claim for breach of fiduciary duty against the selling shareholders, "The complaint does not identify any specific loss to a creditor in its individual capacity. If [debtor] succeeds in its claim against the directors, no particular creditor will benefit from the recovery to any greater extent than any other." *Wieboldt*, 94 B.R. at 508. Such observation is also apt here. Thus, it is clear that the Committee has standing to assert that the Purchasing Defendants have breached their fiduciary duty to Debtor and its creditors.

■■■ The Purchasing Defendants argue that the business judgment rule constitutes grounds for dismissal of Counts VI and VII.[21] However, it is well-established that application of the business judgment rule is a question of fact, and wholly inappropriate for consideration on a motion to dismiss. *Wieboldt Stores, Inc. v. Schottenstein*, 111 B.R. 162, 174 (N.D.Ill.1990)

---

**20.** The Committee need not name in the Complaint those of Debtor's creditors who were post-LBO creditors and who may not be entitled to any funds the Committee may recover from Defendants under the constructive fraud provisions. *See Wieboldt*, 94 B.R. at 509. It is enough under federal notice pleading that the Committee alleges that one creditor has standing to assert the cause of action. Discovery to be taken by Defendants will produce details.

**21.** The Purchasing Defendants also argue that because they, as shareholders, agreed to go forward with the LBO, such shareholder ratification prevents the Committee from raising breach of fiduciary duty claims. However, "where shareholders ... approve of and ratify the misconduct of others, their actions merely create an estoppel against them.... [Shareholder ratification as a defense] does not apply in the context of the liquidation of an insolvent company, for in such a case, it is the creditors who will benefit from any recovery by the corporation." *In re Western World Funding, Inc.*, 52 B.R. 743, 772 (Bankr.D.Nev.1985). Moreover, the issue of shareholder ratification, as a question of fact, cannot be reached on a motion to dismiss.

("Dismissal is especially inappropriate here, where the propriety of the Board's actions will be determined under the business judgment rule"); *Fed. Sav. & Loan Ins. Co. v. Musacchio,* 695 F.Supp. 1053, 1064 (N.D.Cal.1988). Thus, the Purchasing Defendants' objections to the pleadings based upon the business judgment rule have no merit.

■■■■ The Complaint alleges that the Purchasing Defendants and Gelatt owned interests in Aluminum Mills and/or AMAC prior to and after the LBO and therefore directly benefitted from the LBO. The Complaint also alleges that the Purchasing Defendants and Gelatt approved the LBO despite their concurrent knowledge that such transaction would render Aluminum Mills insolvent and unable to meet its obligations as they became due. The Court can reasonably infer from such allegations, taken as true for purpose of considering the instant motions, that the Purchasing Defendants and Gelatt, as directors and officers, acted in their own interests in approving the LBO even though they knew that the LBO would result in harm both to Aluminum Mills and its creditors. Thus, the Complaint alleges sufficient facts to support a cause of action against the Purchasing Defendants for breach of fiduciary duty. *See Wieboldt,* 94 B.R. at 510 (allegations that certain directors directly benefitted from an LBO-related transaction and approved of said transaction notwithstanding their knowledge that it would render the corporation insolvent, were sufficient to plead a cause of action for breach of fiduciary duty). Accordingly, the Motions to Dismiss Counts VI and VII of the Complaint are denied.

### Inducement of Breach of Fiduciary Duty

■■■■ Citicorp moves to dismiss Count IX for failing to plead elements necessary to maintain this action under Illinois law. In this Count, the Committee alleges that "by paying $100,000 to Sigma in exchange for a release of claims, defendant Citicorp knowingly and intentionally induced defendants Miller, Mull, and Mola to breach their fidu-

ciary duties to Aluminum Mills and its unsecured creditors." Complaint ¶ 206. Under Illinois law "[a] third party's inducement of, or knowing participation in, a breach of duty by an agent is a wrong against the principal that may subject the third party to liability." *Corroon & Black of Illinois, Inc. v. Magner,* 145 Ill.App.3d 151, 98 Ill.Dec. 663, 668, 494 N.E.2d 785, 790 (1st Dist.1986). Thus, a party who encourages another to breach his fiduciary duties with the intent to obtain some benefit for himself is jointly and severally liable for the breach. *Id.,* 98 Ill.Dec. at 668–69, 494 N.E.2d at 790–91.

■■■■ Citicorp correctly points out that the success of Count IX is linked to the outcome of Count VII which alleges that Miller, Mola, and Mull breached their fiduciary responsibilities by releasing Citicorp from debtor's claims against it without adequate consideration to the debtor. As pointed out above, Count VII adequately states a claim against defendants Miller, Mola, and Mull. Thus, one necessary element, that a breach of fiduciary duty has occurred is already pleaded. That Citicorp encouraged this breach is also alleged, along with the allegation that Citicorp paid Sigma, which is a company owned by Miller, and did not pay Aluminum Mills to execute the releases. Thus, Count IX sufficiently alleges the claim of inducement of breach of fiduciary duty.

### Preferential Transfers—Section 547

■■■■ Having found that the Complaint sufficiently pleads a cause of action under the applicable fraudulent conveyance laws, the Court accordingly finds that Count V of the Complaint also sufficiently pleads a cause of action to avoid as preferences the transfer of $699,634.86 to Citicorp and the transfer of interests in life insurance proceeds to Gelatt. Defendant Gelatt's objection to the Committee's allegations in this Count is that because the fraudulent conveyance claims should be dismissed, the Committee can no longer assert that the preferential transfers caused Citicorp and Gelatt to receive more than they would have received had Debtor filed a petition

under Chapter 7 of the Code. *See* 11 U.S.C. § 547(b)(5). However, because the Court has found that the Committee has in fact stated valid fraudulent conveyance claims, such objection is without merit at this stage of proceedings. The Committee alleges that the preferential transfers were made within 90 days of the Chapter 11 filing while Debtor was insolvent, and enabled Citicorp and Gelatt to receive more than they would have received had Debtor filed a petition under Chapter 7. On these facts, the Committee has stated a cause of action sufficient to withstand a motion to dismiss. *See In re PM–II Assoc., Inc.,* 100 B.R. 940, 945 (Bankr.S.D.Ohio 1989).

*Equitable Subordination—Section 510(c)*

Citicorp contends that the Committee has failed to allege facts supporting a claim in Count IV for equitable subordination under § 510(c) of the Bankruptcy Code which states:

.., after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

The statute does not set out specific standards to determine when equitable subordination should be ordered. However, the legislative history accompanying § 510(c) indicates that the statute codified existing case law and left to the courts the task of developing the doctrine in the future. *In re Badger Freightways,* 106 B.R. 971 (Bankr.N.D.Ill.1989).

In determining whether to equitably subordinate a claim or interest, the Court must consider the three-prong balancing test of *In re Mobile Steel Co.,* 563 F.2d 692, 702 (5th Cir.1977), which is whether "(1) the claimant creditor has engaged in some sort of inequitable misconduct; (2) the misconduct has resulted in injury to other creditors or in unfair advantage to the miscreant; and (3) subordination of the debt is inconsistent with other provisions of the bankruptcy code." *Matter of Vitreous Steel Products Co.,* 911 F.2d 1223, 1237 (7th Cir.1990). This inquiry must be made "on a case-by-case basis focusing on fairness to the other creditors." *Id.*

There is an emerging view that courts may invoke § 510(c) without any proof of inequitable conduct. *In re Kelton Motors Inc.,* 121 B.R. 166 (Bankr.D.Vt.1990), citing *Matter of Virtual Network Services Corp.,* 902 F.2d 1246, 1249 (7th Cir.1990). In *Virtual Network,* a tax penalty claim of the IRS was subordinated under § 510(c) even though it was conceded that the IRS had not acted inequitably because allowing the IRS penalty claim to hold its priority would only have served to punish the unsecured creditors who were not involved in the debtor's tax evasion. *Id.* at 1250, see also *Burden v. United States,* 917 F.2d 115 (3rd Cir.1990), and *Schultz Broadway Inn v. United States,* 912 F.2d 230 (8th Cir. 1990) (both subordinating IRS penalty claims on similar facts). Citicorp contends that this holding must be limited to its facts. However, in *In re Sterling Homex Corp.,* 579 F.2d 206 (2nd Cir.1978), the court held that the claims of defrauded shareholders could be subordinated to the claims of general creditors even though the defrauded shareholders were presumably innocent. *Id.* at 213. Also, in *Vitreous Steel Products,* a bankruptcy court was admonished to consider this view when ruling on an equitable subordination claim which concerned a secured lender that worked with an investor of its choosing to take control of a troubled borrower before it filed a bankruptcy petition. *Id.* at 1226–29, 1237.

The "fundamental aim" of equitable subordination is to "undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to the creditor in terms of Bankruptcy results." *In re Virtual Network,* 98 B.R. 343, 350 (N.D.Ill.1989), aff'd 902 F.2d 1246 (7th Cir. 1990). This doctrine does not exist to punish errant creditors but to "adjust the

claims of creditors as they stand in equitable relation to each other." *Id.* at 351. Accordingly, the IRS's penalty claim was subordinated in *Virtual Network* so as not to punish innocent creditors for the wrongdoings of the insolvent debtor, and the claims of defrauded shareholders were subordinated in *Sterling Homex* because "only investors should be forced to bear the risk of illegality in the issuance of stock." 579 F.2d at 214.

◼◼◼ Thus, inequitable creditor misconduct may not be necessary when a claim with a low priority (such as a penalty claim) is elevated by the claimant to a position equal to or above the priority of the general unsecured creditors. It is still a requirement where the claims of secured creditors are being challenged. See, e.g., *Matter of EDC, Inc.,* 930 F.2d 1275, 1282 (7th Cir. 1991) (dismissing an equitable subordination claim against a secured lender because no evidence of misconduct was present) and *In re Kelton Motors,* 121 B.R. at 191 (noting the *Virtual Network* view only after finding creditor misconduct). Here, the relief sought is to have Citicorp's secured claims subordinated because it abused its fiduciary duties and engaged in egregious misconduct. The Committee is not alleging that Citicorp is boosting the priority of a penalty or an equitable interest. Therefore, to survive the motion to dismiss, the Committee must have alleged inequitable misconduct by Citicorp.

◼◼◼ The quality of conduct considered to be "inequitable" under § 510(c) depends on the nature of the legal relationship between the creditor and the debtor. *Badger Freightways,* 106 B.R. at 976. In most cases, the creditor is a corporate insider who has breached his fiduciary obligation to the debtor by converting his equity interest into secured debt in anticipation of bankruptcy. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1356 (7th Cir.1990). Financial lending institutions generally do not owe a fiduciary duty to their borrowers. *Badger Freightways,* 106 B.R. at 976, citing *In re W.T. Grant Co.,* 699 F.2d 599, 609 (2nd Cir.1983) *cert. den. sub. nom., Cosoff v.*

*Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). An exception to this rule exists when the lender exerts "dominion and control" over the debtor. *Id.* at 977. Exerting "dominion and control" means that the lender must "exercise sufficient authority over the corporate debtor so as to unqualifiably dictate corporate policy and the disposition of assets." *Id.* at 982, quoting *In re Babcock Dairy Co. of Ohio,* 70 B.R. 657, 661 (Bankr.N.D.Ohio 1986). A close relationship between the debtor and lender is not enough to make the lender a fiduciary, nor is it sufficient to show that the lender could have exerted leverage by threatening to exercise its contractual rights. *Id.* at 982.

Thus, a complaint has not sufficiently alleged that the lender was a fiduciary if it merely alleges that the lender had a source of power but does not allege how it exercised its power. Citicorp contends that its security interest was merely a potential source of power and asks for dismissal because the Committee has not alleged any instances in which Citicorp has used its security interest to control a decision. It relies on *Matter of Clark Pipe & Supply Co., Inc.,* 893 F.2d 693 (5th Cir.1990), which states that "the crucial distinction between what is inequitable and what a lender can reasonably and legitimately do to protect its interests is the distinction between the existence of 'control' and the exercise of that control to direct the activities of the Debtor." *Id.* at 701. It also likens this case to the facts in *Badger Freightways.*

In *Badger,* the lender recommended that the debtor hire two men with whom the lender had a "close relationship" to be the debtor's chief financial officer and chief operating officer. 106 B.R. at 973. The lender further advised that the debtor delegate day-to-day management authority to them, and the debtor complied. *Id.* Approximately two years later, one of them was fired and the other quit, and three months after that, the lender demanded to have its loan repaid. *Id.* The equitable subordination claim was dismissed because the debtor's theory was that the two men were agents of the lender, but the com-

plaint failed to allege any facts which demonstrated that this agency relationship existed. *Id.* at 978. Thus, the lender in *Badger* was shown to be influential but not controlling.

The Committee alleges that Citicorp's source of power was its security interest in 85% of Aluminum Mills' stock and its $100,-000 payment to Sigma. They allege that Citicorp used its power to control a variety of key decisions made by the debtor's management including:

the termination and replacement of the debtor's president and other executive officers; the purchase and sale of equipment; the payment of consulting and management fees; the payment of other obligations; the purported release of the debtor's claims against Citicorp and Gelatt; the debtor's bankruptcy filing; the ability of the debtor's shareholders to sell or convey their stock in the company; and the right and ability of the debtor to make investments, enter into contracts, borrow money, lease property, and compensate its officers, directors, and employees. Committee's Complaint at ¶ 166.

The Committee further alleges that Citicorp used its control to keep the debtor in business while it was insolvent in order to frustrate potential fraudulent conveyance claims against Citicorp, and to induce the management to release any claims debtor had against it and waive any objections debtor had against Citicorp's secured claim in the debtor's bankruptcy estate.

From the foregoing it must be concluded that the Committee has alleged both a source of power and alleged instances in which power was exercised. Viewing the allegations in a light most favorable to the Committee in considering the instant motion, it is reasonable to infer that Citicorp used its source of power in order to control the decisions that they allegedly controlled.

Furthermore, this Complaint alleges the sort of facts which the court found to be lacking in *Badger*. The thrust of the Complaint is that Citicorp used a carrot and stick approach to control the debtor through payments to Sigma and the securi-

ty interest in 85% of the debtor's stock. It alleges that Citicorp did with its power by giving the list of decisions that Citicorp controlled, in ¶ 166 of the Complaint. Finally, the payment to Sigma demonstrates the circumstances that motivated the debtor's officers to release the claims against Citicorp and motivated defendant Miller to resign as president. In sum, this complaint sufficiently pleads that Citicorp exerted dominion and control over the debtor because it describes the source of Citicorp's power, how Citicorp exercised its power, and the motivation of the debtor's officers to act according to Citicorp's will.

■ Citicorp also contends that the allegations are insufficient because the Committee has failed to specifically allege how it controlled the day-to-day activities of the debtor. Citicorp's insistence that control equals day-to-day control misreads *Badger Freightways*. Control means "operating control of the debtor's business," because only then does the lender assume the fiduciary duty owed by corporate insiders. *Badger Freightways*, 106 B.R. at 976. The guiding principle is that the lender is liable as a fiduciary if it assumes the power of a fiduciary. Therefore, operating control does not necessarily mean day-to-day control, but may simply be control over the decisions that a corporate fiduciary is expected to make. Decisions concerning the termination and replacement of executives, the release of claims, and the filing of a bankruptcy petition are certainly issues which would be decided by fiduciaries. It is sufficient for purposes of a motion to dismiss for the Committee to allege that Citicorp controlled these and other major decisions, and therefore claim that Citicorp became a fiduciary.

The Committee also alleges that even if Citicorp is not an insider, its conduct amounts to "gross misconduct tantamount to fraud, misrepresentation, and overreaching." Committee's Complaint at ¶ 172. In support of this claim, they allege that Citicorp was the principal lender in an LBO which it knew would cause the debtor to become insolvent. They also allege that Citicorp's actions in paying $100,000 to Sig-

ma as consideration for release of all debtor's claims against debtor, and its actions in delaying the debtor's bankruptcy filing amounted to gross misconduct.

 If the creditor is not a fiduciary, equitable subordination may still be applied, but the conduct must be much more egregious. *Id.* at 976. Where the debtor and creditor have dealt at arm's length, "subordination depends on a combination of inequitable conduct, unfair advantage to the creditor, and injury to the other creditors." *Kham & Nate's*, 908 F.2d at 1356. There is no duty of "kindness" among non-fiduciaries. *Id.* at 1357. Merely enforcing the terms of a contract does not give rise to an equitable subordination claim. *Id.* Indeed, a non-fiduciary may act strategically to protect itself to the potential detriment of others. *Badger Freightways*, 106 B.R. at 976. Inequitable conduct for a non-fiduciary means "breach *plus* some advantage-taking," *Kham & Nate's*, 908 F.2d at 1357, or else "gross misconduct tantamount to fraud, overreaching, or spoliation to the detriment of similarly situated claimants." *Badger Freightways*, 106 B.R. at 976.

 This claim survives the Citicorp's motion to dismiss for two reasons. First, the Committee has already alleged sufficient facts concerning the release of the debtor's claims against Citicorp in consideration for its payment to Sigma to survive a motion to dismiss on its fraud claim. Thus, the Committee has alleged that Citicorp has been a party to a fraudulent act which has potentially injured other creditors. Second, the Committee has also sufficiently alleged facts in Count IX to show that Citicorp induced Miller, Mola, and Mull to breach their fiduciary duties to the debtor in order to benefit Citicorp. This is tantamount an allegation of overreaching. Fraud and overreaching are the kind of egregious misconduct that equitable subordination is meant to address when non-fiduciary creditors are involved. Based on the allegations, it may well be inequitable to allow Citicorp to benefit to the detriment of other creditors as a result of its actions. Thus, Citicorp's motion to dismiss must be

denied even if it were not alleged to be a fiduciary.

 It should be noted that merely alleging that Citicorp knowingly made a loan for an LBO that it knew would result in insolvency and then acted strategically after the LBO to maximize its benefits is insufficient, by itself, to show that Citicorp engaged in "egregious misconduct." *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 938–39 (D.Colo.1990) ("the trustee simply alleges that [the bank] knew or should have known that the loan transaction would render [debtor] insolvent ... the allegations against the bank do not approach the level of gross misconduct.")

The Committee's complaint has alleged sufficient facts to show, under standards considered on a motion to dismiss, that Citicorp assumed the power of a fiduciary and acted strategically to protect itself to the detriment of the debtor and unsecured creditors. The Committee has also sufficiently alleged that Citicorp was engaged in fraud and overreaching by its payment to Sigma which induced Miller, Mola, and Mull to breach their fiduciary duties to the debtor. These allegations, if proven, could possibly show that Citicorp used its power over the debtor to enhance its position at the expense of the debtor and the unsecured creditors. To the extent that the unsecured creditors could prove that they were harmed by this, they have alleged a valid claim under § 510(c) because all three prongs of the *Mobile Steel* test will be met. Therefore, Citicorp's motion to dismiss the equitable subordination claim must be denied.

## CONCLUSION

Accordingly, for the reasons stated above, by separate order the Motions to Dismiss are all denied.