**In re OCTAGON ROOFING,
d/b/a Western Modified
Roofing, Debtor.**

**BRAAS SYSTEMS, INC., Plaintiff,**

v.

**WMR PARTNERS, Defendant.**

**Bankruptcy No. 90 B 8656.
Adv. No. 91 A 27.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

April 3, 1992.

Cheryl L. Urbanski, Jones Day Reavis & Pogue, Chicago, Ill., Fordham E. Huffman, Jones Day Reavis & Pogue, Columbus, Ohio, for plaintiff.

Donald Johnson, Hollis & Johnson, Chicago, Ill., trustee.

Howard L. Adelman, Brad A. Berish, Adelman, Gettleman & Merens, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

This cause came for hearing on the four-count Complaint of Braas Systems, Inc. ("BSI"), seeking various forms of equitable relief against the defendant WMR Partners ("WMR"). A trial was held before the Court on February 12, 13, 14, 20, 21, 24, 26, and 27, 1992. The Court, having considered the evidence, the arguments of counsel, and all submissions in the record, and otherwise being fully advised in the premises, does hereby make and enter its Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 as follows:

### FINDINGS OF FACT

1. On May 10, 1990, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Octagon Roofing d/b/a Western Modified Roofing (the "Debtor"). On June 21, 1990, the Debtor consented to an order for relief under Chapter 7 of the Bankruptcy Code. On or about July 9, 1990, the Office of the United States Trustee appointed Donald E. Johnson as interim trustee (the "Trustee").

2. Prior to its bankruptcy, the Debtor was a manufacturing entity engaged in the manufacture of modified bitumen roofing products at a plant (the "Plant") in Fernley, Nevada. On October 9, 1990, the Trustee filed a motion to sell the Plant, equipment, and other property of the Debtor free and clear of liens, pursuant to 11 U.S.C. § 363 (the "Sale Motion").

3. In connection with the Sale Motion, on November 27, 1990, WMR filed a motion for allowance of its secured claim against the Plant and for valuation of this security, pursuant to Sections 502 and 506 of the Bankruptcy Code (the "WMR Motion"). WMR claimed a first mortgage security interest in the Plant by virtue of a Deed of Trust given by the Debtor in connection with an advance by WMR of $525,000 to the Debtor on June 9, 1989 (the "WMR Mortgage").

4. Although BSI had not been served with the WMR motion, it was served with the Sale Motion, which gave BSI actual notice of the WMR Mortgage.

5. On December 7, 1990, BSI filed an unsecured claim in the Debtor's bankruptcy case in the amount of $250,000, evidenced by its Note dated October 17, 1988 (the "BSI Note"). On December 7, 1990, BSI filed an objection (the "BSI Objection") to the WMR Motion and prayed that the Court (i) overrule the WMR Motion; (ii) equitably subordinate the WMR Mortgage to the BSI Note, pursuant to Section 510 of the Bankruptcy Code; and (iii) impress a constructive trust in favor of BSI upon the WMR Mortgage.

6. On December 12, 1990, this Court entered an order determining that WMR held an allowed secured claim against the Debtor's Plant in the amount of $613,991.10 plus interest which continued to accrue, which was secured by a valid, subsisting, and perfected first mortgage filed on July 18, 1989. On December 13, 1990, this Court entered an order authorizing the sale of the Debtor's assets, including the Plant, to the NBD Park Ridge Bank (the "NBD

Bank") for $2,220,000 and directing the NBD Bank to pay WMR $613,991.10 plus per diem interest in cash. The Court valued the Plant at $1,060,000 for purposes of finding an apportionment between the Plant and the other assets sold. On December 12, 1990, the Court (i) overruled the BSI Objection; (ii) ordered WMR's counsel to hold $275,000 of the sales proceeds attributable to the WMR Mortgage pending further order of Court; and (iii) gave BSI thirty days within which to commence an appropriate proceeding to press its claims for relief against WMR.

7. On January 9, 1991, BSI filed the above-referenced complaint against WMR, seeking equitable subordination of WMR's claim to that of BSI's, the declaration and enforcement of an equitable mortgage on BSI's behalf, and the impression of a constructive trust in BSI's favor, on proceeds received by WMR in payment of its claim (the "Complaint"). In its answer, WMR denied certain material allegations in the Complaint, and set up as affirmative defenses the doctrines of waiver, estoppel, unclean hands, and laches.

8. On December 30, 1991, this Court entered an order settling an adversary action between the Trustee and the NBD Bank (90 A 873), filed in the Debtor's bankruptcy case, under which the Trustee released any and all claims that the Trustee may have against WMR arising out of the WMR mortgage.

*The Parties*

9. The relationship between BSI, WMR, and the Debtor has its roots in the formation of a partnership in February, 1987 called Western Modified Roofing ("Western"). There were two equal partners of Western, namely the Debtor, which was an affiliate of WMR, and MSP Systems, Inc., a Delaware corporation ("MSP"), which was a wholly-owned subsidiary of BSI. Much of the dispute involved in this cause of action arises from the BSI note granted by the Debtor to BSI in October, 1988 in connection with the dissolution of the Western partnership, whereby BSI and their affiliates withdrew from Western, leaving the

Debtor, who continued to operate the entity.

10. Eugene Scott, Elmer Jansen, Ned Kimbrel, Richard Rosenow, Myron Alcock, and Pino Vidozzi (collectively, the "Roofing Partners") are the general partners of WMR, an Illinois general partnership. The Roofing Partners also held ownership interests in the Debtor, American Roofing Systems, an Illinois limited partnership ("ARS"), and American Roofing Corporation, a Delaware corporation ("ARC"). Prior to 1990, ARC and ARS, like the Debtor, were also engaged in business with the modified bitumen roofing product (the "Roofing Product"). (ARC and ARS shall be collectively referred to as "ARC/ARS".) ARS manufactured the Roofing Product in Countryside, Illinois. ARC purchased the Roofing Product from ARS and the Debtor, and resold it to roofing distributors. The Roofing partners, along with other partners, had started ARC/ARS prior to 1983 and had been operating those entities for several years prior to Western's formation in 1987. Mr. Eugene Scott was the president of ARC, ARS, and the Debtor.

11. BSI is a holding company owning 100% of the shares of The Barra Corporation of America, Inc., a New Jersey corporation ("Barra") and MSP. BSI was, in turn, a wholly-owned subsidiary of Braas & Co. GmbH, a German company ("Braas & Co."). BSI, MSP, Barra, and Braas & Co. shall be collectively referred to hereinafter as "Braas". Prior to 1989, Barra had sold roofing materials in the United States and had been purchasing its Roofing Product solely from ARS, both before and after the formation of Western in 1987. Mr. Joseph Heim is from New Jersey and is the president of BSI and Barra and a director of MSP. Throughout Braas' relationship with Western, the following individuals from Germany held the following positions in Braas: Dr. Ruths was an officer of Braas & Co.; Hartmut Kuesel was an officer of Braas & Co. and a director of BSI; Hermann Hechler was an officer of Braas & Co., a director of BSI, and a Policy Committee member (defined later) of Western; Hubert Leitsch was an officer of Braas & Co., and a Policy Committee member of West-

ern; and Erich Gerlach was an officer of Braas & Co. and a director of BSI. In addition, Mr. William Coquillette, an attorney with the Cleveland, Ohio office of Jones, Day, Reavis & Pogue was Braas' attorney and was also a director and secretary for MSP. Mr. Coquillette was also an alternate on the Policy Committee of Western, which will be hereinafter described.

### Formation of the Partnership

12. Prior to 1987, Mr. Heim, on behalf of Braas, contacted Mr. Scott, the president of ARC/ARS, about forming a joint venture between Braas and ARC/ARS under which they would build and operate at least one plant which manufactures and sells Roofing Product. At that time, Braas' subsidiary, Barra, had been purchasing Roofing Product from ARS and selling it in the United States; however, Braas did not manufacture its own Roofing Product.

13. In mid–1986, Mr. Heim prepared and sent a detailed review of the proposed joint venture (the "Outline") to his superiors in Germany at Braas & Co., which outlined the advantages to Braas of entering into the partnership with ARC/ARS. In the Outline, Mr. Heim detailed (i) the potential profitability of the venture for Braas, (ii) the experience, know-how, and past success of ARC/ARS and the Roofing Partners in the roofing business, and (iii) the expected growth in demand in the future for the Roofing Product.

14. In December 1986, Braas & Co. and ARC/ARS agreed to form Western as a partnership under which they would locate, construct, and operate a facility to manufacture Roofing Product (the "Basic Agreement"). The two equal partners of Western were MSP on behalf of Braas and the Debtor on behalf of ARC/ARS. The partnership agreement and related formation agreements were entered into in February 1987 (these agreements, including the Basic Agreement, shall be collectively referred to hereinafter as the "Formation Agreements"). The Formation Agreements provided that three individuals from each partner would be appointed to a Policy Commit-

tee that would establish basic policy decisions of Western (the "Policy Committee").

15. The Formation Agreements contained two supply agreements which provided that, once Western became operational, Barra would be obligated to purchase a minimum of 5,000,000 square feet of Roofing Product per year from Western, and ARC would be obligated to purchase a minimum of 12 million square feet of Roofing Product per year from Western, each at a price of 32 cents per square foot (the "Partner Price"), which price was subject to change as agreed upon by the Policy Committee.

16. As agreed upon in the Formation Agreements, the capital contributions of each partner to Western consisted of a $500,000 cash contribution by Braas and a contribution of capital from ARC/ARS in the form of technical information and know-how in the possession of ARC/ARS which was necessary for the start-up of Western and the manufacture of the Roofing Product. In the Formation Agreement, the partners valued the ARC/ARS contribution of capital at $500,000. In connection with the contribution of technical information by ARC/ARS to Western, ARC/ARS executed a primary license agreement in February 1987, granting a license to Western in perpetuity for the manufacture, sale, and application of the Roofing Product and for the use of its technical information in the manufacture and sale of the Roofing Product, which included reports, studies, manufacturing processes, techniques, methods, chemical compositions, etc. Also, in connection with the ARC/ARS contribution of know-how, the day-to-day operating and start-up responsibilities were to be carried out by ARC/ARS, which responsibilities included locating and supervising the construction of a manufacturing plant, purchasing equipment, hiring employees, and implementing the technical information necessary for the start-up of the Western operation. Mr. Scott and Mr. Vidozzi, on behalf of ARC/ARS, were primarily involved in this contribution of know-how and the day-to-day management of Western and, in conformity with the Formation Agreements, their salaries were to

be paid by ARC/ARS for their services to Western. Each of the partners subsequently made their capital contributions to Western.

17. Pursuant to ¶ 4.2 of the Basic Agreement, the partners agreed that the total financing needs of Western for the construction, purchase, and start-up of the Plant would be $4 million. The Basic Agreement also set forth that these funds shall be obtained from the $500,000 capital contribution of MSP and the remainder from borrowed funds. The Basic Agreement set forth that the borrowed funds were to be obtained by Western; however, it also set forth that, in the event that "guarantees and/or provisions of security" were required for funding, each partner "shall use their best efforts to provide and to cause their Affiliates to provide such guarantees as may be reasonably required ... provided, that such guarantee and/or security obligations shall be shared equally between (i) Braas & Co. and its Affiliates, and (ii) ARS, ARC, and their Affiliates" (the "Equal Sharing Provision"). The partners anticipated that guarantees and/or other security would be required by the lending institutions for these borrowings.

18. The partners intended that ARC/ARS would manage the day-to-day operations and start-up of the venture, whereas Braas would merely share in the financing and policy decisions of the venture. Mr. Heim was primarily the individual on behalf of Braas to remain apprised of the day-to-day start-up operations of Western, and he periodically reported the status of Western to his superiors in Germany. Mr. Scott and Mr. Vidozzi were the primary individuals on behalf of ARC/ARS that were involved in the start-up and day-to-day management of Western.

*Financing and Start–Up of Western*

19. In December 1987, Western signed a note for a $2.5 million line of credit from the NBD Bank in order to purchase the equipment line for Western (the "Equipment Loan"). The Equipment Loan was secured by the personal property of Western, including the equipment line, invento-

ry, and receivables, and ARS guaranteed the equipment Loan through a repurchase agreement (the "ARS Guarantee"). The Equipment Loan was drawn down by $2.1 million by September 1988 in order to purchase the equipment line for the Plant.

20. Mr. Scott, on behalf of ARC/ARS, located a site for the Western facility and in January, 1988, Western entered into an agreement to purchase 150 Lyon Drive, Fernley, Nevada consisting of approximately ten acres (the "Land"). In 1988, Western paid $148,750 for the Land and for improvements thereto.

21. Partly through Mr. Scott's efforts, in January 1988 Western entered into a construction contract to construct the Plant on the Land. The Plant was completed in 1988 at a total cost of approximately $1,438,000.

22. Throughout 1988, Western sought financing for the purchases and construction of the Plant from various lenders. The lenders which Western approached for financing of the Plant required (1) either a letter of credit or a guarantee, and (2) a mortgage or a negative/positive pledge whereby Western would promise not to encumber the Building and to grant a first mortgage on the Plant upon the lender's request.

23. The partners had agreed at a Policy Committee meeting held on August 5, 1987 that the Plant would be financed at 80% of value. Mr. Heim testified that 80% financing for the Plant was what he understood that lenders offered. In subsequent letters dated March 10, 1988, August 16, 1988, and September 23, 1988, between Mr. Heim, Mr. Leitsch, and Mr. Hechler, the 80% financing for the Plant was referred to and anticipated.

24. Though several letters sent on March 10, 1988, May 23, 1988, August 4, 1988, August 12, 1988, August 24, 1988, and September 9, 1988 by Mr. Heim to his superiors in Germany (including Mr. Leitsch and Mr. Hechler), Braas was informed that (i) Western had entered into a construction contract for the Plant in January 1988 that would cost in excess of $1.3 million; (ii) ARS had guarantied the $2.5

million Equipment Loan; (iii) Western needed money to fund the construction of the Plant; (iv) it had been agreed that the total financing needs for Western were $4 million; and (v) Braas had an obligation to obtain an equal amount of the financing for Western.

25. In August 1988, there was possible financing available to Western that Braas was aware of, which included: (i) a loan for the Plant from Metropolitan Capital Corporation for $1.4 million or 75% of appraised value, whichever is less, plus 1.5 points at 11.25% interest, with interest and principal payable monthly based on a 20–year amortization with the balance due in the 120th month. This loan required a first deed of trust on the Building and an irrevocable letter of credit; and (ii) a loan from the Deutsche Bank for a $1 million working capital line for one, two, three, or six months at prime $+\frac{1}{4}\%$ and a $1 million term loan at 10.6% interest, due in five years, all of which required a negative/positive pledge and an unconditional guarantee issued by Braas & Co.

26. In 1988, Braas, with knowledge of ARS' guarantee of the Equipment Loan of $2.5 million, declined to provide a letter of credit or to give a guarantee required by two lenders offering financing for the Plant. In mid–1988, in response to cash needs of Western, Braas advanced $500,000 to Western for construction of the Plant. Notwithstanding this advance by Braas, (i) Western fell behind in the payments due on the construction of the Plant; (ii) the contractor filed a construction lien against the Building on or about August 29, 1988; and (iii) the contractor threatened foreclosure in early October, 1988 on its claim exceeding $700,000.

### Divorce of Western Partnership

27. In September 1989, Mr. Heim told Mr. Scott that Braas desired to get out of the roofing business in America, including the Western venture. On September 28, 1988, representatives of Braas, including Mr. Gerlach, Mr. Heim, Mr. Hechler, and their attorney, Mr. Coquillette, met with representatives of ARC/ARS, including Mr. Scott, Mr. Jansen, Mr. Alcock, Mr. Kimbrel, Mr. Rosenow, their attorneys, Mr. Jim Quinn and Mr. Jack Reidy, and their accountants, Mr. John Quinn and Mr. Jack Walsh, in Chicago to discuss Western and its future and Braas' desire to terminate its interest in Western. The ARC/ARS representatives presented a calculation of damages prepared by their accountants which estimated that, if Braas withdrew, it must pay in excess of $3 million to the Debtor based upon its obligations set forth in the Formation Agreements. Among the other subjects discussed were the need for permanent financing and ARC/ARS' contention that Braas was not performing under the Basic Agreement in providing necessary guarantees or other security to allow Western to obtain financing. This financing need was in the form of debt financing, not capital, because the partners had already put in their capital contributions. A dispute also arose over what the Partner Price of the Roofing Product would be once the Plant began manufacturing. The parties did not resolve their differences at the September 28, 1988 meeting.

28. The next day, September 29, 1988, Braas' attorney, Mr. Coquillette, prepared two letter agreements. One letter agreement provided that Braas would remain in Western (the "Letter Agreement") and the other letter agreement provided that Braas would withdraw from Western (the "Termination Agreement"). Mr. Coquillette reviewed the Letter Agreement with Mr. Gerlach and Mr. Hechler, who each signed it on behalf of Braas, and then sent it to ARC/ARS' attorney, Mr. Jim Quinn, on September 29, 1988. The Letter Agreement provided, among other things, that:

(a) "The urgency of securing additional financing in the amount of $1,600,000 is clear to each party."

(b) ARC/ARS had previously obtained a $2.1 million dollar loan for Western, and Braas had previously arranged for a $500,000 advance to Western.

(c) Braas was to obtain permanent financing for Western with a $2.1 million loan from the Deutsche Bank (the "Deutsche Loan"), secured by the Plant, however, if the Deutsche Loan cannot be

closed properly within two business days after receipt of ARC/ARS' signed copy of the Letter Agreement, then Braas would lend Western $1.6 million themselves (the "Braas Loan") until permanent financing was obtained. The Braas Loan would be secured by the Plant. (d) A procedure would be followed for insuring that, once the Deutsche Loan was obtained by Braas, the guarantees of the two partners of Western would be equal pursuant to the Equal Sharing Provision set forth in the Basic Agreement. (e) The Partner Price dispute would be resolved by setting the Partner Price of Roofing Product at 32 cents per square foot when Western started manufacturing.

29. On September 30, 1988, October 4, 1988, and October 7, 1988, the Debtor's attorney, Mr. Jim Quinn, responded by letter to Braas' attorney, Mr. Coquillette, stating that ARC/ARS refused to execute the Letter Agreement and demanding that Braas contribute their share of Western's financing, as was required by the Equal Sharing Provision of the Basic Agreement.

30. On October 7, 1988, Mr. Gerlach wrote Mr. Scott, offering to have Braas sell its ownership interest in Western to the Debtor if Braas would purchase the Plant for $1.7 million and lease it back to the Debtor for $170,000 per year, with an option to repurchase after five years. On October 7, 1988, the Debtor and ARC/ARS (i) rejected Braas' offer to withdraw and to purchase the Plant from Western, and (ii) agreed to execute the Letter Agreement.

31. Braas did not obtain the permanent financing from the Deutsche Bank within the two-day period set forth in the Letter Agreement. Thereafter Braas prepared and forwarded to ARC/ARS an unexecuted note and mortgage evidencing the interim financing of $1.6 million, which Braas was obligated to provide under the Letter Agreement.

### The Termination Agreement and the Issuance of the BSI Note

32. Representatives of the two partners met in a New York airport hotel on October 17, 1988. At this meeting on behalf of Braas were Mr. Gerlach, Mr. Heim, and their attorney, Mr. Coquillette; and on behalf of ARC/ARS/Debtor were Mr. Scott, Mr. Kimbrel, Mr. Jansen, their attorney Mr. Jim Quinn, and their accountant Mr. Jack Walsh. At the meeting, Braas' representatives presented to the ARC/ARS representatives a draft proposed Termination Agreement which their attorney, Mr. Coquillette, had prepared. After certain modifications to the Termination Agreement, the parties, on behalf of the Debtor, ARC, ARS, Braas & Co., BSI, MSP, and Barra, agreed to enter into the Termination Agreement, ultimately signed and dated October 17, 1988, under which:

(a) All the Braas entities were released from all obligations related to Western and the Formation Agreements.

(b) Braas assigned to the Debtor all of its interests in Western, including its $500,000 capital contribution and its $500,000 advance.

(c) The Debtor executed in favor of BSI the BSI Note for $250,000 at 5% interest. Interest did not begin accruing until October 1, 1993. Principal and interest on the BSI Note were payable in six semi-annual installments which did not commence until April 1, 1994.

(d) The BSI Note stated that the Debtor thereby granted "to BSI a security interest in all inventory, accounts receivable, machinery, equipment, buildings, fixtures and land now owned or hereafter acquired by [Western], which security interest shall only be subordinated to the security interests granted to lenders of [Western] in connection with the construction, equipping and operations at the Plant owned by Western near Reno, Nevada and consistent with the lenders' normal advance rates." (the "Subordination Provision").

33. The BSI Note and its Subordination Provision are clear and unambiguous. It clearly states that the security interest granted to BSI would be subordinated to any future security interests that would be granted to any "lenders" for loans to be obtained for use in "construction, equip-

ping and operations at the Plant ...'' so long as said loans were consistent with "normal advance rates." Parol evidence is not required to interpret the Note. Indeed, the circumstances surrounding its creation are compatible with that plain reading. The BSI Note was part of the Termination Agreement and was also prepared by Mr. Coquillette on September 29, 1988. The parties made changes to the amount and payment terms of the Note; however, the Subordination Provision was primarily left in its original form with the exception of the phrase "and consistent with the lenders' normal advance rates," which was added by Mr. Coquillette at the New York meeting. The parties' agreed intent was that, in return for future loans, the Debtor could grant future security interests in the assets of the Debtor which would be superior to the security interests granted under the BSI Note, as long as such loans were in connection with the Debtor's operations and made under normal commercial lending terms. Mr. Scott testified that the Braas representatives were concerned that the Debtor might grant future security interests in the Debtor's assets which would wipe out any equity cushion in those assets, thereby leaving no collateral to secure the BSI Note. In response to this concern, Mr. Coquillette added the phrase "consistent with the lenders' normal advance rates" to ensure that the future loans to be obtained by Debtor were at normal asset-based advance rates. This language was intended to ensure that there would be a cushion of equity available to secure the BSI Note at the time of such future loan or loans. Nothing in the language of the BSI Note barred loans from non-commercial lenders so long as the terms were commercially normal. The plaintiff's effort to limit the right to subordinate to institutional lenders is an attempt to read into the Note limiting language that the parties did not draft.

34. Mr. Scott testified that at the meeting the ARC/ARS/Debtor entities had wanted to receive money from Braas in order to let them withdraw. However, the Braas representatives insisted that they had to take something back to Germany in order to satisfy their superiors. Mr. Scott testified that they (ARC/ARS/Debtor) agreed to give the BSI Note to Braas because it was not due for 5½ years, the interest was so small, and the Note would not hinder the Debtor's attempts to get future financing. The Debtor's experienced accountant, Mr. Jack Walsh of Doty, Jarrow & Co., who was present at the New York meeting, testified that, based upon the terms and negotiations of the BSI Note, it was really just a "throw away note", one with highly conditional, remote, and limited value.

35. The BSI Note provided that the Debtor "shall promptly execute and deliver any such mortgage, financing statements, or other instruments reasonably requested by BSI to perfect its security interest in the foregoing collateral." However, BSI did not request a perfected security interest in any of the assets of the Debtor to secure the BSI Note at the New York meeting or at any time thereafter until nearly a year later, on or about September 27, 1989. To BSI, the BSI Note and security interest was indeed an instrument of limited value and significance.

### The WMR Mortgage

36. In June 1989, the Roofing Partners formed WMR. On June 9, 1989, WMR loaned the Debtor $525,000 and received a first mortgage on the Plant (the "WMR Mortgage"). At that time the Plant was unencumbered. These funds were used in the Debtor's operations concerning the Plant. The WMR Mortgage bore interest of 11½% and was payable in five equal annual installments of $160,382.20 beginning in two years on June 9, 1991. The Roofing Partners considered these funds a loan to the Debtor and not a capital contribution.

37. According to Braas' attorney, Mr. Coquillette, under the terms of the BSI Note, the Debtor was under no obligation to inform BSI when it had obtained future financing. The Plaintiff received constructive notice of the Defendant's mortgage upon its filing with the county recorder's

office of Lyon County, Nevada on July 19, 1989. ·

38. Based· on largely undisputed evidence presented, it is clear that 80% was the normal asset-based lending rate at the time of the WMR Mortgage. Furthermore, although WMR presented an appraisal of the Plant at $2 million as of November 1, 1988, this Court finds from the evidence that the value of the Plant in June, 1989 was between $1.7 million and $1.8 million. The WMR Mortgage of $525,000 was less than a third of the value of the Plant and was well within the normal asset-based lending rate, as contemplated by the parties to the BSI Note and provided in that Note. Furthermore, the interest rate and terms of the WMR Mortgage were well within normal ranges, based upon the evidence presented of other alternative loans that were available to Debtor at that time.

### Operations of the Debtor Following Braas' Withdrawal

39. Following Braas' withdrawal from Western on October 17, 1988, the Debtor was in immediate need of funds to pay off the construction lien and avoid foreclosure. In the next two and-a-half months, the Debtor (i) obtained an $815,000 loan from ARC as an advance on future purchases by ARC from the Debtor, and (ii) drew down the remaining $400,000 on the $2.5 million line of credit with the NBD Bank. These funds were applied to pay the delinquent construction costs on the Building and other start-up costs. Thereafter, the construction lien against the Plant was released. These funds replaced the urgent need for financing expressed in the Letter Agreement that Braas was to have obtained just prior to the dissolution of Western. The Debtor did not need any additional financing as of December 31, 1988, and it began producing and selling Roofing Product in late 1988, following Braas' withdrawal.

40. On January 27, 1989, the Debtor held an official opening ceremony at its Plant, at which time it shipped to purchasers approximately two million square feet of Roofing Product at a sale price of approximately $600,000. This shipment was the largest one-day shipment ever experienced by any of the Roofing Partners' entities. In 1989, ARC was the major purchaser of Roofing Product from the Debtor.

41. Manufacturing and sales of Roofing Product by the Debtor proceeded in 1989, although the business did suffer losses during that year. The Debtor's March 31, 1989 unaudited financial statement exhibited a net loss of $161,655. However, partner's capital was shown on the books at a positive $310,952. The Debtor's trial balance worksheet, dated June 30, 1989, exhibited a net income of $183,290 and a positive partner's capital balance of $755,897.[1] There was testimony that the Roofing Partner's entities had been delinquent in their payment of accounting fees to their outside accountants, Doty, Jarrow & Co. As a result, that accounting firm required all of the Roofing Partner entities, including ARC/ARS and the Debtor, to pay for their accounting work on an advance fee basis. However, Mr. Jack Walsh testified that the Debtor, unlike ARC/ARS, was a new entity and was primarily current on the payment of all of its bills to its creditors in 1989. The evidence also revealed that the Debtor had been current on its loan payments to the NBD Bank in 1989.

42. By June 1989, the Debtor had reduced the $815,000 ARC loan to approximately $215,000 and was in need of additional funds for its operations. There was outside financing available to the Debtor in 1989; however, these loans all required guarantees. The Roofing Partners were not satisfied with the terms of the loans offered, and therefore did not wish to post the guaranties necessary to obtain outside financing. Instead, the Roofing Partners

---

1. The Debtor's outside accountant, Mr. Jack Walsh, a partner at Doty, Jarrow & Co., testified that, prior to June 30, 1989, the Debtor's accountant had left the company and was replaced by a new individual that was not familiar with the Debtor's computer operations on which its books and records were kept. Consequently, Mr. Walsh testified that the figures in the June 30, 1989 trial balance, which were prepared by the Debtor's new in-house accountant, were unreliable.

formed WMR to loan $525,000 to the Debtor on June 9, 1989, out of their personal assets.

43. Unlike the Debtor, ARC/ARS were experiencing financial difficulty in 1989, primarily as a result of some defective Roofing Product which ARS had produced and ARC had sold. As a result of this defective product, both ARC and ARS had experienced significant liabilities relating to warranties which they had given their customers. In 1989, ARS had loans outstanding to the NBD Bank of approximately $4 million. The NBD Bank became very concerned about the status of its loans to the Roofing Partners entities as a result of the ARS difficulties. In August 1989, the Debtor signed a forbearance agreement with the NBD Bank and other Roofing Partners entities, including ARC/ARS, in order to stop the bank from foreclosing on all the bank loans with these entities. Under this agreement, the Debtor granted a $1 million mortgage to the NBD Bank. It was the Roofing Partners' understanding that the Bank had wanted this mortgage to secure the Bank's loans with the Debtor, which had fallen into default as a result of ARS' financial problems. The Debtor was current in its payments due under the Equipment Loan to the Bank at this time. However, ARS' financial problems constituted a default under the Debtor's security agreements with the NBD Bank because ARS was the guarantor of the Equipment Loan. The Roofing Partners' entities, including the Debtor and ARC/ARS entered into the Forbearance Agreement with the Bank in order to stave off foreclosure and acquire more time in which to improve operations or sell the businesses entirely.

44. In mid-November 1989, the NBD Bank seized the receivables of the Debtor and ARC/ARS as a result of the poor financial condition of ARC/ARS, which constituted a default under the Debtor's Equipment Loan security agreements. In mid-November 1989, the Debtor ceased its manufacturing operations.

*Tender of Security Documents*

45. After the Debtor had granted a first mortgage to WMR and a second mortgage to the NBD Bank, and nearly a year after it had issued the BSI Note, Mr. Heim, on behalf of BSI, presented Mr. Scott with security documents to sign on or about September 27, 1989. In addition, on or about September 27, 1989, Braas' attorney mailed the same documents to the Debtor's attorney. While Mr. Heim had discussed the need for security documents with Mr. Scott in August 7, 1989, BSI did not tender to Debtor the requested security agreements to secure the BSI Note until September 27, 1989. When Mr. Scott received this request for a mortgage, he was in the midst of negotiating a sale of the Debtor's business, along with the businesses of ARC/ARS. Thereafter, Mr. Scott referred the security request to his attorneys and suggested that Mr. Heim have Braas' attorneys contact the Debtor's attorneys regarding the matter.

46. Debtor did not sign the security documents when presented with them in September of 1989. Braas did not follow up on this initial request for signatures until January 25, 1990, when Braas' attorney sent the security agreements to the Debtor's attorney once again. However, this time the Debtor's counsel responded that the security documents did not contain the proper name of the Debtor and were therefore not correctly prepared. Thereafter, Braas' attorney corrected the security agreements and returned them to the Debtor's attorney. However, on February 14, 1990, involuntary Chapter 7 petitions were filed against ARC and ARS. The Debtor's attorney wrote Braas' attorney on February 28, 1990, advising Braas that it would not be appropriate for the Debtor to execute the security agreements at that time in light of the involuntary bankruptcy filings against ARC/ARS, which were related entities of the Debtor.

47. BSI never asserted that it held a first lien against the Plant until December 5, 1990, when it appeared in this Court, only eight days before the Plant was sold pursuant to the Trustee's Sale Motion, and asserted that it held an unrecorded and unwritten first mortgage on the Plant.

48. Statements of fact set forth in the Conclusions of Law below and statements made by the Court from the bench at the conclusion of trial shall stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

### *Jurisdiction*

1. This proceeding is the tail end of the disposition of the Debtor's Plant through proceedings in the related bankruptcy case, pursuant to the Trustee's Motion filed in October, 1990, to sell the Plant and related property. This Adversary case involves a dispute between BSI and WMR over the priority of liens against the Plant, a dispute involving $250,000 (the amount of the BSI Note). In order to permit the sale to consummate in the face of the BSI objections and dispute with WMR, while preserving the controversy for later resolution, an order entered December 12, 1990, set aside $275,000 of the sale proceeds from sale of the Plant into an interest bearing fund held by WMR's counsel (the "Escrow"). By order entered December 13, 1990, this Court authorized the sale of the Plant to the NBD Bank and directed the Bank to pay WMR approximately $613,-991 on its first mortgage, including principal and interest. From that sum, WMR's counsel was to and did withhold $275,000 pending further order of court, pursuant to the earlier Court Order entered December 12, 1990.

2. "The starting point for determining whether an action is a core proceeding is 28 U.S.C. § 157(b)(2), which contains a nonexclusive list of matters that are considered 'core proceedings.'" *Barnett v. Stern,* 909 F.2d 973, 979 (7th Cir.1990). This dispute over the Escrow is the second step in the sale of the Plant, and the Escrow itself was set up as a necessary means for consummating the sale for the benefit of the estate and its creditors. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(O) which provides, in pertinent part, that core proceedings include "proceedings affecting

the liquidation of the assets of the estate." Both parties conceded core jurisdiction. This Court has jurisdiction pursuant to 28 U.S.C. § 1334.

3. BSI argues that this Court also has jurisdiction over and above the Escrow, so that, if they were successful in this action, it could obtain relief against WMR for the amount of their claim which exceeds the value of Escrow.[2] However, this Court has no jurisdiction above and beyond the disposition of the Escrow. The sales proceeds in excess of the Escrow were distributed to WMR pursuant to this Court's order dated December 13, 1990. Those funds are no longer property of this estate. "A proceeding is core under Section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." (citation omitted). *Diamond Mortgage Corp. of Ill. v. Sugar,* 913 F.2d 1233, 1239 (7th Cir.1990). Any action by BSI against WMR which seeks relief above and beyond the Escrow does not involve the Debtor or its assets, does not invoke a substantive right provided by Title 11, and could not necessarily have arisen only in the context of a bankruptcy case. Therefore, any resolution of the matter going beyond the Escrow would not involve a "core proceeding" under 28 U.S.C. § 157(b)(2).

4. Section 157(c) provides instances where a bankruptcy judge may hear a non-core proceeding that is "related" to a case under Title 11. "A controversy is not 'related' to the bankruptcy within the meaning of § 157(c) unless its resolution 'affects the amount of property available for distribution or the allocation of property among creditors.'" (citations omitted) *Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir.1989). A resolution in this matter going beyond the Escrow will not affect the amount of property available for distribution nor will it affect the allocation of property among creditors. Therefore,

---

**2.** Although no evidence was presented at trial, BSI alleged that its claim against WMR totals in excess of $275,000, which includes the amount

of the BSI Note of $250,000, plus attorneys' fees and costs permitted under the Note.

there is no "related" jurisdiction in this Court above and beyond the Escrow.

## Count I

■ 5. Under Count I of the Complaint, BSI seeks to equitably subordinate the WMR Mortgage to the BSI Note on grounds that the Roofing Partners' conduct was inequitable under § 510(c) of the Bankruptcy Code. Section 510(c) of the Bankruptcy Code provides that:

... after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

This Court considered the standards for equitable subordination in *In re Aluminum Mills Corp.*, 132 B.R. 869 (Bankr. N.D.Ill.1991). The statute does not set out specific standards to determine when equitable subordination should be ordered. However, the legislative history accompanying § 510(c) indicates that the statute codified existing case law and left to the courts the task of developing the doctrine in the future. *Id.* at 893.

■ 6. In determining whether to equitably subordinate a claim or interest, the Court must consider the three-prong balancing test of *In re Mobile Steel Co.*, 563 F.2d 692, 702 (5th Cir.1978), which is whether "(i) the claimant creditor has engaged in some sort of inequitable misconduct; (ii) the misconduct has resulted in injury to other creditors or in unfair advantage to the miscreant; and (iii) subordina-

tion of the debt is [not] inconsistent with other provisions of the bankruptcy code." *Id.*, citing *Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1237 (7th Cir.1990).

■ 7. BSI argues that it need not prove inequitable creditor misconduct in order to equitably subordinate the WMR Mortgage to the BSI Note. It is true that inequitable creditor misconduct may not be necessary when a claim with a low priority (such as a penalty claim) is elevated by the claimant to a position equal to or above the priority of the general unsecured creditors. However, it is still a requirement where the claims of secured creditors are being challenged. *Aluminum Mills*, 132 B.R. at 894, and cases cited. In this case, BSI seeks to subordinate the secured claim of WMR, and therefore, inequitable creditor misconduct must be shown.

■ 8. WMR constitutes an "insider" within the meaning of 11 U.S.C. § 101(31), because it is composed of the Roofing Partners, who are also partners in the Debtor. If the claimant is an insider, the proponent has the burden of presenting material evidence of unfair conduct. The burden then shifts to the claimant to prove the fairness of his transactions with the debtor or the claim will be subordinated. *In re Holywell Corp.*, 913 F.2d 873, 880–81 (11th Cir.1990); *see also Matter of Lemco Gypsum, Inc.*, 911 F.2d 1553, 1557 (11th Cir.1990). This allocation of burden had its genesis in *Mobile Steel*. The court in *Mobile Steel* found that "the proper rule is that 'the claimant's verified proof of claim obliges the objecting trustee to come forward with enough substantiations to overcome the claimant's prima facie case and thus compel him to actually prove the validity and honesty of his claim.' " (citation omitted). *Mobile Steel*, 563 F.2d at 701.[3]

---

**3.** The court in *Mobile Steel* reasoned that:

An objection resting on equitable grounds cannot be merely formal, but rather must contain some substantial factual basis to support its allegation of impropriety. Absent such a requirement, the wide-ranging inquiry authorized by the *Kansas City Journal–Post* case would place an unwarranted burden on fiduciaries by requiring them to prove the good faith and fairness of every one of their

actions with respect to their corporation at the pleasure of the Trustee. This would be tantamount to the adoption of a rule that claims advanced by fiduciaries are invalid simply because of the nature of the relation existing between the claimant and the bankrupt. For reasons that should be obvious— among them, a desire not to discourage those most interested in a corporation from attempting to salvage it through an infusion of

This burden of proof does not necessarily apply in this matter. The thrust of Count I is the allegation that WMR was inequitable because the WMR Mortgage was not entitled to a superior position to BSI's security interest in the Plant under the terms of the BSI Note. This issue is essentially one of contract interpretation under the terms of the BSI Note.

█ The provision at issue within the BSI Note provides that it was to be secured by the assets of the Debtor, "which security shall only be *subordinated* to the security interests granted to *lenders* of Western Modified in connection with the construction, equipping, and *operations* at the plant owned by Western Modified Roofing near Reno, Nevada and *consistent with the lenders' normal advance rates.*" (emphasis added). The uncontroverted evidence presented is clear that the security interest granted in the BSI Note would be subordinate to future security interests given to "lenders" of the Debtor in connection with the "operations" of the Plant. There is no material dispute that the WMR Mortgage loan was used for the Debtor's operations. The only question that arose at trial was whether the WMR loan was "consistent with the lenders' normal advance rates", as described in the BSI Note.

Authorities have held that "in a breach of contract action, [the] plaintiff must establish ... the terms of the contract, plaintiff's performance of all contractual conditions required of him and defendant's breach of the terms of the contract." *Pearlman v. Time, Inc.*, 133 Ill.App.3d 348, 88 Ill.Dec. 524, 528, 478 N.E.2d 1132, 1136 (1st Dist.1985); *See also Mannion v. Stallings & Co., Inc.*, 204 Ill.App.3d 179, 149 Ill.Dec. 438, 442, 561 N.E.2d 1134, 1138 (1st Dist.1990); *Vandevier v. Malay Plastics, Inc.*, 135 Ill.App.3d 787, 90 Ill.Dec. 558,

561, 482 N.E.2d 377, 360 (1st Dist.1985). Therefore, the burden here was on BSI to prove by a preponderance of the evidence that the WMR Mortgage loan was not a proper loan authorized under the terms of the BSI Note.[4]

9. The Subordination Provision is clear and unambiguous on its face, and there is no need for to examine parol evidence to the interpret its meaning. Clearly, the Subordination Provision permits the BSI Note to be subordinated to any lender's security interest so long as the loan is made with interest rates, lending advance rates, and terms which are within the range of terms then offered by commercial lenders. However, even if the Subordination Provision were viewed as ambiguous, then parol evidence admitted supports and corroborates this interpretation.

10. BSI contends that "lenders", as referred to in the BSI Note, only meant institutional lenders and, therefore, the security interest granted in the BSI Note could only be subordinated to "institutional lenders". BSI contends that, since WMR was an insider and not an institutional lender of the Debtor, its mortgage was not entitled to come ahead of the BSI Note.

"Where the terms of an agreement are not clear, the court will construe the contract to give effect to the intent of the parties. [citation omitted]. The intention of the parties will be ascertained by an examination of all the facts and circumstances manifested by the evidence, including ... the purpose or object for which [the contract] was created. [citation omitted]. When ascertaining intent, the court may construe the words used in the contract according to their 'ordinary, natural and commonly accepted meaning unless it clearly appears that

---

capital—we have steadfastly refused to endorse such a principle.
*Mobile Steel*, 563 F.2d at 701.

**4.** This burden on BSI is bolstered further by the fact that the BSI Note was written by BSI's attorney, Mr. Coquillette, and, to the extent that the pertinent language in the BSI Note is ambiguous, the Note must be construed against BSI. *See Duldulao v. Saint Mary of Nazareth Hospi-*

*tal*, 106 Ill.Dec. 8, 13, 505 N.E.2d 314, 319 (1987) ("Ambiguous contractual language is generally construed against the drafter of the language."); *See also Bank of·North Carolina v. Rock Island Bank*, 570 F.2d 202, 207 (7th Cir.1987). However, the Note was negotiated with aid of counsel and experienced businessmen on both sides, and the Court does not rely on this principle.

the parties intended to ascribe to them a peculiar or unusual meaning.' "

*First Commodity Traders v. Heinhold Commodities,* 766 F.2d 1007, 1014 (7th Cir. 1985). The preponderance of the evidence did not show that the parties intended to limit "lenders" under the BSI Note to "institutional lenders" only. The term "lenders" is not defined in the Note nor is it capitalized or italicized.

"The overriding goal of contract interpretation is to give effect to the reasonable expectations of the parties." *Lowrance v. Hacker,* 888 F.2d 49, 51 (7th Cir.1989). The evidence was clear that the parties recognized that the Debtor was in need of financing at the time of entry into the Termination Agreement and issuance of the BSI Note. Mr. Walsh, the Debtor's accountant, who also attended the New York meeting where the BSI Note was negotiated, testified that the BSI Note was a "throw away" note. The Roofing Partners, including Mr. Scott, Mr. Jansen, and Mr. Kimbrel, testified that, from their understanding of the negotiations over the BSI Note, they believed that the BSI Note would be, in effect, an unsecured note because it came after security interests granted to future lenders. Although this non-legal interpretation of the BSI Note by businessmen was not technically correct, it illustrates the understanding of the parties that the BSI Note would not interfere with the Debtor's ability to grant liens to future lenders. The evidence clearly showed that it was understood between the parties that future loans were needed by the Debtor and that the BSI Note was not intended to hinder the Debtor's ability to grant future security interests in the assets to any future lenders who would supply a need for funds that was then foreseen.

The evidence did not establish that the parties discussed or intended that the Debtor could not grant future security interests to insiders for future financing under the terms of the BSI Note. To the contrary, the Letter Agreement prepared by BSI's attorney, Mr. Coquillette, on the same day that he had prepared the BSI Note, provided that Braas, as a partner (and "insider") of Western, was to provide $1.6 million to Western in return for a mortgage on the Plant. Therefore, the preponderance of evidence presented does not establish intent or agreement that the Debtor could not grant security interests to insiders for future financing under the terms of the BSI Note.

11. BSI also contends that the WMR Mortgage was not at "normal advance rates", and it was therefore not entitled to a superior position to the security interest granted to BSI under the BSI Note. From the evidence presented, "normal advance rates" meant that security interests could only be granted to lenders for those loans which had commercially normal interest rates, terms, and asset-based lending advance rates based upon other lenders' terms and rates at that time. From the evidence presented, Mr. Coquillette added the term "consistent with the lenders' normal advance rates" to ensure that the Debtor would not grant security interests in its assets to future lenders which would effectively eliminate all of the equity in the Debtor's assets, thereby leaving no equity to secure the BSI Note. Based upon Findings of Fact stated above, at the time of the WMR Mortgage in June, 1989, the normal asset-based lending advance rate was 80%, and the value of the Plant was between $1.7 million and $1.8 million. The WMR Mortgage for $525,000 was well below the normal lenders' asset-based lending advance rate at that time and did not then jeopardize the 20% equity cushion which the BSI Note sought to preserve for BSI's security interest in the Plant. In addition, the interest rate of 11½% on the WMR Mortgage was also within the normal range of interest demanded by other lenders at that time. Finally, the loan had no points and the repayment terms of the WMR Mortgage loan provided that payments were due in five equal annual installments which did not begin for two years. These additional terms were also within the range of terms for loans available to debtor at that time. Therefore, the preponderance of the evidence presented shows that the WMR Mortgage Loan was according to the "lenders' normal advance rates" as provid-

ed by the BSI Note and contemplated by the parties.

12. Nor has it been established that the Roofing Partners were involved in a pre-conceived scheme to eliminate the 20% equity cushion in the Plant contemplated under the BSI Note when it granted (i) the WMR first mortgage in June 1989, and then (ii) the NBD Bank second mortgage in August 1989. It has not established that WMR foresaw the collapse of the Debtor and ARC/ARS at the time of the WMR Mortgage. The evidence does not indicate that the Roofing Partners acted improperly in granting the WMR Mortgage to obtain funds for the Debtor's operations, and later granting the second mortgage to the NBD Bank in order to stave off foreclosure of its operations.

13. Finally, BSI contends that WMR was inequitable in not executing the security agreements securing the BSI Note which it presented to it in September 1989. There is evidence of an error in the initial draft of the security documents which was corrected by BSI and then sent back to the Debtor in late January 1990. Thereafter, on or about February 28, 1990, the Debtor, through its counsel, refused for the first time to sign the documents because its related entities, ARC/ARS, had been placed into involuntary bankruptcy. Debtor was contractually obligated to cause the papers to be signed at that time. However, even if the Debtor had signed the corrected security agreements in early 1990, that would have given BSI only a third mortgage on the Plant. Carrying this supposition even further, if this third mortgage would have entitled BSI to some rights in the Escrow, then BSI might have some rationale for subordinating WMR's Mortgage to the BSI Note.[5] Yet, this third lien position would not have entitled BSI to any recovery under the BSI Note in the Debtor's Bankruptcy case because the Plant had sold for $1,060,000 pursuant to this Court's

Order executed on January 3, 1991. These sale proceeds were not enough to satisfy the NBD Bank second mortgage, let alone a putative third mortgage in favor of BSI. The "fundamental aim" of equitable subordination is to "undo or offset any inequity in the claim position of a creditor in terms of Bankruptcy results." *Aluminum Mills*, 132 B.R. at 893. Therefore, the fact that the Debtor did not execute the security agreements in early 1990 does not warrant equitable subordination relief in favor of BSI because it would not have changed the claim position of BSI in the bankruptcy case. Its theoretical rights to a third mortgage at that time are mooted by the facts here.

14. For reasons set forth above, BSI has failed to meets its burden to show by a preponderance of the evidence that WMR violated the terms of the BSI Note by making the WMR Mortgage loan. Therefore, the Court must conclude that equitable subordination under § 510(c) of the Bankruptcy Code is not warranted under Count I.

### Count II

■ 15. Under Count II of the Complaint, BSI seeks to equitably subordinate the WMR Mortgage to the BSI Note on the ground that the WMR loan to the Debtor was really a contribution of capital rather than a loan because it alleges that the Debtor was undercapitalized at the time of the loan and was unable to obtain financing from another source. Authority on equitable subordination has found undercapitalization to be evidence of inequitable conduct. *In re UNR Industries, Inc.*, 46 B.R. 25, 28 (Bankr.N.D.Ill.1984). However, such authority also found that undercapitalization alone is not a sufficient reason to find equitable subordination. *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir.1991); see also *Mission Bay Campland v. Sumner Financial Corporation*, 731

---

5. This argument would, of course, have to be weighed against other arguments raised by WMR in their defenses, including laches, estoppel, unclean hands, and waiver, which relate to the fact that BSI delayed nearly a year before even requesting that the Debtor execute security agreements to perfect the security interests granted under the BSI Note. The Court has indicated doubts as to the validity of these defenses. However, it is unnecessary to analyze these defenses in light of rulings against BSI on all of its counts.

F.2d 768, 772 (11th Cir.1984); *Wood v. Richmond (In re Branding Iron Steakhouse)*, 536 F.2d 299, 302 (9th Cir.1976). "It is only when undercapitalization is combined with inequitable conduct, such as fraud, spoilation, mismanagement, or faithless stewardship, that the claims of dominant or controlling shareholders and other insiders will be subordinated." *In re N & D Properties, Inc.*, 54 B.R. 590, 601 (N.D.Ga.1985). "Any other [analysis] would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a foundering company." *Id.; see also Lemco Gypsum*, 911 F.2d at 1557. Therefore, since this Court has already found no proof of inequitable conduct by WMR under Count I of the Complaint, Count II of the Complaint must also fall because, regardless of whether the Debtor was undercapitalized or not at the time of the WMR Mortgage loan, that factor alone is not enough to find equitable subordination.

■ Apart from the fact that BSI has insufficient cause to equitably subordinate the WMR Mortgage, BSI has failed to show material and persuasive evidence of undercapitalization of the Debtor at the time of the WMR Mortgage loan. It is BSI's burden to show that the Debtor was undercapitalized. *See Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr.N.D.Fla. 1990).

■ 16. There are several factors that courts have looked at to determine if the transfer constitutes a loan or a capital contribution. One such determination is the substance rather than the form of the advance. That is, if the funds are advanced with a reasonable expectation of repayment, they are loans, but if repayment depends on the success of the venture, the funds are capital. *See In re Transystems, Inc.*, 569 F.2d 1364, 1370 (5th Cir.1978), quoting Herzog and Zweibel, *The Equitable Subordination of Claims in Bankruptcy*, 15 Vand.L.Rev. 83, 94–95 (1961).

The preponderance of evidence in this case shows that Debtor and WMR treated the WMR transfer as a loan rather than a capital contribution. Furthermore, the weight of evidence presented fails to show that the Debtor was insolvent when the WMR loan was made. The Debtor's March 31, 1989 unaudited financial statement did show a loss of $161,655. However, the Debtor had only recently started up its business and its partners' capital account showed a positive $310,952 at the same date. Furthermore, the Debtor's trial balance worksheet for the six months ending June 30, 1989 actually showed a net income figure of $183,290 and a positive partners' capital balance of $755,897. Although the Debtor's outside accountant discounted the reliability of the June 30, 1989 statement, these figures and the weight of evidence as a whole does not demonstrate insolvency in June 1989.

BSI argues that the Debtor was in financial trouble in June 1989 because the Debtor's outside accountants had placed the Debtor and ARC/ARS on an advance pay basis in early 1989. This was evidence that the Debtor had not been current on its accountant's bills in the past. However, it does not demonstrate that the Debtor was insolvent in June 1989. In fact, the partner for the Debtor's outside accountant, Mr. Walsh, testified that the Debtor was a new company and was generally current in payment of its bills to creditors in 1989.

There is no evidence that WMR made the loan in June, 1989 in contemplation of insolvency or bankruptcy. To the contrary, at that time, the Debtor's principals were optimistic about its operations and Debtor owned an unencumbered Plant worth between $1.7 million and $1.8 million. The evidence indicates that a subsequent problem with ARS, resulting from warranty liability problems, eventually led to Debtor's problems with the NBD Bank that induced that Bank to seize the receivables of ARS and Debtor in November 1989.

Finally, BSI contended that an outside lender would not have advanced money to Debtor in June 1989 because Debtor was not financially capable of repaying the

debt. However, BSI has presented no evidence whatsoever from any outside lenders or from any source that Debtor was not capable of repaying a similar loan or that a lender would not have made a loan to Debtor in light of its financial status in June 1989. This argument was unsupported by material evidence. Indeed, in light of the financial ability of WMR Partners to provide the necessary loan themselves, evidence indicates that such a loan would have been possible with their guaranties, but was rejected in favor of a loan giving more favorable terms to Debtor.

17. Another factor recognized under prior case law as to whether an entity is undercapitalized is to examine

> ... what reasonably prudent men with a general background knowledge of the particular type of business and its hazards would determine was reasonable capitalization in the light of any special circumstances which existed at the time of incorporation of the now defunct enterprise.

*Mobile Steel*, 563 F.2d at 703.

For BSI to argue that the Debtor was undercapitalized contradicts with the fact that BSI and its related entities, Braas, had agreed in the Formation Agreements that Western (Debtor) was to be capitalized with $500,000 in cash from Braas, $500,000 in know-how from ARC/ARS and $3.5 million in debt financing. The uncontroverted evidence presented showed that at the time of Western's formation, the Roofing Partners were reasonably prudent men with a general background knowledge of the roofing product business having already formed and been operating a similar business at ARS. Braas agreed with the capitalization requirements [6] set forth in the Formation Agreements. The evidence presented illustrates that, by June 1989, the Debtor had been operating its Plant for over six months and had met its $4.5 million capitalization and financing requirements as had been agreed upon in the Formation Agreements as follows:

| | |
|---|---|
| Braas capital | $ 500,000 |
| ARC/ARS capital | 500,000 |
| Braas loan | 500,000 |
| NBD Loan (secured by inv., a/r, equip.) (ARS Guarantee) | $2,500,000 |
| ARC Loan | 215,000 |
| WMR Loan | 525,000 |
| | $4,740,000 |

The testimony of Mr. Scott indicated that the WMR loan was to replace a portion of the ARC loan of $815,000, which had been loaned to the Debtor against future purchases in late 1988, and which had been subsequently reduced to approximately $215,000 by June 1989. Furthermore, Mr. Scott testified that the Debtor was not in need of further funds after the WMR loan. Therefore, BSI has failed to present persuasive evidence that the Debtor was not adequately capitalized in June 1989.

18. Braas also argues that the Debtor could not have obtained a similar amount of funds from an outside source. The oft-cited case of *Mobile Steel* states another factor of under-capitalization:

> Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.

*Mobile Steel*, 563 F.2d at 703.

BSI contends that the Debtor could not have obtained outside financing in June 1989 and that, even if such financing were available, it required a guaranty which the Debtor also could not obtain. BSI failed to provide persuasive evidence that outside lenders would not have loaned the Debtor a similar amount in June 1989. The evidence presented actually showed that outside loans were available to the Debtor; however, the Debtor preferred to obtain a loan from the Roofing Partners themselves on terms which were more favorable to the Debtor. Under the terms of the WMR Mortgage Loan, the Debtor did not have to pay any points and its repayment term was longer than outside lenders had offered. In addition, the Debtor owned a completely unencumbered building worth between $1.7

---

**6.** There has been no evidence that a capitalization ratio of 1/4.5 is not normal in the roofing product industry.

million and $1.8 million in June 1989, which this Court finds would have enabled the Debtor to offer more than adequate security to an outside lender to obtain a loan of $525,000. Finally, the fact that guaranties may have been required by outside lending sources does not alter this Court's findings, because the mere fact that the Roofing Partners were able to loan the Debtor $525,000 in cash on June 9, 1989 indicates that they were capable of guaranteeing a similar amount from an outside source.

For the reasons set forth above, the evidence did not demonstrate that the Debtor was undercapitalized at the time of the WMR loan.

### Counts III and IV

19. Under Counts III and IV of its Complaint, BSI seeks an equitable mortgage on the Plant and a Constructive Trust against the Escrow. "Under Illinois law, equitable liens arise in two general situations: when a written contract reflects the parties' intent to satisfy a debt from a particular property, or when a court grants equitable relief in light of the parties' relationship and dealings."[7] *Small v. Beverly Bank*, 936 F.2d 945, 949 (7th Cir.1991). A constructive trust is appropriate where the party in possession has obtained the property through the party's misconduct, or is unjustly enriched through possession of the property. *See CFTC v. Heritage Capital Advisory Services, Ltd.*, 823 F.2d 171, 172 (7th Cir.1987); *American National Bank and Trust Co. of Rockford, Ill. v. U.S.*, 832 F.2d 1032, 1035 (7th Cir.1987).

BSI correctly conceded during closing arguments that the success of Counts III and IV of its Complaint were dependent on the success of Counts I and II. Therefore, since this Court has ruled in favor of WMR on Counts I and II, then it also finds in favor of WMR on Count IV, and, for reasons stated above, Count III is moot.

Finally, in light of rulings above, the defenses of unclean hands, laches, estoppel, and waiver raised by WMR need not be decided.

---

**7.** The parties concede that Nevada equitable lien law is similar to Illinois equitable lien law.

### CONCLUSION

Accordingly, for the reasons stated above, by separate Judgment Order, judgment is entered this date in favor of WMR on Counts I, II, and IV, and Count III is dismissed as moot.